**THIRD DIVISION
MILLER, P. J.,
RAY and DILLARD, JJ.**

**NOTICE: Motions for reconsideration must be _physically received_ in our clerk's office within ten days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/**

**November 14, 2012**

# In the Court of Appeals of Georgia

A12A0979. UPPER CHATTAHOOCHEE RIVERKEEPER, INC. v. FORSYTH COUNTY et al.

DILLARD, Judge.

This case involves the Georgia Environmental Protection Division's (the "EPD") issuance of a permit to Forsyth County, authorizing two of the county's water-reclamation facilities to discharge treated wastewater into the Chattahoochee River. Following the issuance of the permit, Upper Chattahoochee Riverkeeper, Inc., ("UCR") challenged the EPD's decision by filing a petition with the Office of State Administrative Hearings. The County intervened to defend the permit, and although the presiding administrative law judge ("ALJ") dismissed most of UCR's claims on summary determination, after an evidentiary hearing, the ALJ ruled that the permit was issued in violation of Georgia's water anti-degradation rule and ordered the

Director of the EPD to reissue the permit with stricter effluent-discharge limits. Subsequently, the EPD and County sought superior-court review. The superior court reversed the ALJ's decision and remanded the case for further proceedings. UCR now appeals, arguing that the superior court erred by (1) failing to properly interpret the anti-degradation rule, (2) treating an EPD guidance document as governing law, (3) ignoring Supreme Court of Georgia precedent, and (4) finding that the ALJ lacked the authority to order the director of the EPD to reissue the permit with revised effluent limits. For the reasons set forth *infra*, we affirm all but one aspect of the superior court's ruling.

The record shows that on August 18, 2010, the EPD, a division of the Georgia Department of Natural Resources, issued a National Pollutant Discharge Elimination System ("NPDES") permit to Forsyth County, authorizing the discharge of treated wastewater from the Fowler and Shakerag water reclamation facilities ("WRFs") into the Chattahoochee River approximately nine miles downstream from the Buford Dam and 27.5 miles upstream from the Morgan Falls Dam. The permit authorized the WRFs to discharge six million gallons of treated wastewater per day into the river. In addition, the permit established limits for the quality of the discharged wastewater by placing restrictions on effluents such as phosphorus and fecal coliform bacteria.

2

Specifically, the permit limited the WRFs' combined monthly average discharge of fecal coliform[1] to 200 colony-forming units per 100 milliliters of water ("cfu/100ml") and limited the monthly average discharge of total phosphorus[2] to 0.3 milligrams per liter ("mg/l").

Concerned about the impact of the proposed Fowler/Shakerag WRFs' discharge on the quality of the water in the river, on September 16, 2010, UCR filed a petition with the Office of State Administrative Hearings, challenging the EPD-issued permit on six separate grounds and requesting an evidentiary hearing before an ALJ.[3] The County intervened to defend the permit, and thereafter, all three parties filed motions for summary determination, which were argued in a hearing before the

---

[1] Although fecal coliform bacteria are not *per se* harmful, they suggest the presence of pathogenic bacteria, viruses, and protozoan commonly found in fecal matter.

[2] Phosphorus, itself, is not toxic, but excessive levels may result in eutrophication, *i.e.*, rapid algal growth, which may result in the formation of cyanobacteria or other harmful toxins, and oxygen depletion, which can trigger fish kills.

[3] *See* OCGA § 12-2-2 (c) (2) (A) ("Any person who is aggrieved or adversely affected by any order or action of the director shall, upon petition to the director within 30 days after the issuance of such order or the taking of such action, have a right to a hearing before an administrative law judge of the Office of State Administrative Hearings . . . .").

ALJ. On December 8, 2010, the ALJ issued an order on the motions for summary determination, dismissing five of UCR's six claims. But the ALJ ruled that UCR's claim that the permit violates Georgia's water anti-degradation rule survived summary determination and scheduled an evidentiary hearing to determine whether, pursuant to the rule, the permit's discharge-pollutant limits would lower the water quality in the river, and if so, whether such degradation was "necessary to accommodate important economic and social development."[4]

Subsequently, the ALJ conducted a lengthy evidentiary hearing, during which expert witnesses on both sides testified as to whether the permit limits for fecal coliform and phosphorus would degrade the water quality in the river and whether it was economically feasible for the Fowler/Shakerag WRFs to comply with more stringent limits for those two pollutants. Following the conclusion of the hearing, the ALJ issued a final decision, finding that the EPD issued the permit in violation of the anti-degradation rule in that it failed to properly assess whether the level of pollutants in the permitted discharge would result in degradation of the river and, if so, whether such degradation was necessary to accommodate important economic and social development. Consequently, the ALJ remanded the permit to the Director of the EPD

---

[4] *See* Ga. Comp. Rules & Regs. r. 391-3-6-.03 (2) (b) (ii).

for re-issuance of the permit with revised monthly average discharge limits of 23 cfu/100 ml for fecal coliform and .08 mg/l for total phosphorus.

Shortly thereafter, Forsyth County and the EPD sought review of the ALJ's ruling in the Superior Court of Forsyth County. Both the County and the EPD argued, *inter alia*, that the ALJ erred in its interpretation of the anti-degradation rule, which required a stricter threshold inquiry than the plain meaning of the rule mandates. The superior court agreed, specifically finding that the ALJ erred in interpreting the anti-degradation rule as focusing on the particular limits of certain pollutants in the additional discharge rather than on the capacity of the additional wastewater as a whole. The superior court also ruled that the ALJ exceeded her authority in remanding the permit to the EPD with the directive that it revise the monthly average discharge limits. Subsequently, UCR filed an application for discretionary appeal with this Court, which we granted. This appeal follows.[5]

---

[5] *See* OCGA § 5-6-35 (a). No questions of jurisdiction have been raised by the parties in this case. Regardless, if this Court finds that it has no jurisdiction over an appeal, "it has the authority to dismiss the appeal on its own motion." *Coastal Marshlands Prot. Comm. v. Altamaha Riverkeeper, Inc.*, 304 Ga. App. 1, 3 (695 SE2d 273) (2010) (punctuation omitted). Under OCGA § 50-13-20, judicial review on appeal to one of the appellate courts of this State is limited to final orders. Here, based on our holding in *Coastal Marshlands Protection Committee v. Center for a Sustainable Coast*, 286 Ga. App. 518, 520 (1) (649 SE2d 619) (2007), we find that the superior court's order was an appealable final judgment under OCGA § 50-13-20.

At the outset, we note that this Court conducts "a de novo review of claimed errors of law in the superior court's appellate review of an ALJ's decision."[6] Furthermore, the interpretation of a statute or regulation is a question of law and, thus, is also reviewed *de novo* on appeal.[7] With these guiding principles in mind, we now address UCR's claims of error.

1. UCR contends that the superior court erred in its interpretation of the Georgia water quality anti-degradation rule. Specifically, it argues that the superior court's interpretation allows water quality degradation that is not necessary to accommodate important economic or social development. We disagree.

---

And while, based on *Hughey v. Gwinnett County*, 278 Ga. 740, 740-41 (1) (609 SE2d 324) (2004), we have doubts about the soundness of the jurisdictional decision in *Center for a Sustainable Coast*, such doubts are not reason enough to revisit that decision in this case. *See Benefield v. Tominich*, 308 Ga. App. 605, 613 (708 SE2d 563) (2011) (Blackwell, J., concurring dubitante) ("As a general principle, the application of the doctrine of stare decisis is essential to the performance of a well-ordered system of jurisprudence." (punctuation omitted)).

[6] *Coastal Marshlands Prot. Comm. v. Altamaha Riverkeeper, Inc.*, 315 Ga. App. 510, 511 (726 SE2d 539) (2012); *see Ctr. for a Sustainable Coast*, 286 Ga. App. at 521 (2).

[7] *See Adventure Outdoors, Inc. v. Bloomberg*, 307 Ga. App. 356, 358 (1) (705 SE2d 241) (2010).

6

In construing agency regulations, we employ the basic rules of statutory construction and look to the plain language of the regulation to determine its meaning.[8] Nevertheless, even if words are apparently plain in meaning, they must not be read in isolation and instead, must be read in the context of the regulation as a whole.[9] Furthermore, "we must defer to an agency's interpretation and enforcement of its own rules."[10]

Turning to the statutory scheme and regulation at issue here, pursuant to the Federal Clean Water Act, the individual states are permitted to enact and administer their own water-quality programs, subject to certain federal minimum standards.[11] Toward that end, OCGA § 12-5-21 (a) of the Georgia Water Quality Control Act provides in part that "the water resources of the state shall be utilized prudently for

---

[8] *Pfeiffer v. Dep't of Transp.*, 250 Ga. App. 643, 646-47 (2) (551 SE2d 58) (2001); *see also Walker v. Dep't of Transp.*, 279 Ga. App. 287, 292 (2) (a) (630 SE2d 878) (2006).

[9] *Pfeiffer*, 250 Ga. App. at 247 (2).

[10] *Walker*, 279 Ga. App. at 292 (2) (a); *see Bentley v. Chastain*, 242 Ga. 348, 350-51 (1) (249 SE2d 38) (1978) (noting that "agencies provide a high level of expertise and an opportunity for specialization unavailable in the judicial or legislative branches").

[11] *See* 33 U.S.C. § 1313.

the maximum benefit of the people, in order to restore and maintain a reasonable degree of purity in the waters of the state and an adequate supply of such waters . . . ."[12] And OCGA § 12-5-30 mandates that any person owning or operating a facility that discharges a pollutant from a point source into the waters of the State must obtain an NPDES permit prior to any such discharge.[13] In Georgia, the Board of Natural Resources (the "Board") is the agency responsible for promulgating rules and regulations governing the administration of the NPDES.[14] And pursuant to that responsibility, the Board promulgated a rule pertaining generally to anti-degradation of water-quality standards, Ga. Comp. R. & Regs. r. 391-3-6-.03, as well as a separate rule pertaining to effluent limits for discharge permits, Ga. Comp. R. & Regs. r. 391-3-6-.06. Finally, the responsibility for administering and enforcing the NPDES program in the State falls to the EPD.[15]

The specific issue for determination by the ALJ in the case *sub judice* was whether the NPDES permit granted to Forsyth County's Fowler/Shakerag WRFs

---

[12] *See* OCGA § 12-5-21 (a).

[13] *See* OCGA § 12-5-30 (a).

[14] *See* OCGA § 12-5-23 (a) (1) (C), (J).

[15] *See* OCGA § 12-5-23 (b) (3), (c) (15); OCGA § 12-5-30.

8

violated the Georgia water quality anti-degradation rule. That rule, in relevant part, provides:

> Where the quality of the waters exceed levels necessary to support propagation of fish, shellfish, and wildlife and recreation in and on the water, that quality shall be maintained and protected unless the division finds, after full satisfaction of the intergovernmental coordination and public participation provisions of the division's continuing planning process, *that allowing lower water quality* is necessary to accommodate important economic or social development in the area in which the waters are located.[16]

In its order granting in part and denying in part the County's motion for summary determination, the ALJ construed Ga. Comp. R. & Regs. r. 391-3-6-.03 (2) (b) (ii) such that the "EPD, as part of its anti-degradation review, was required to assess whether the level of pollutants in the permitted discharge would result in degradation of the receiving water, and if so, whether such degradation was 'necessary to accommodate important economic and social development.'" Then upon finding that the EPD failed to comply with the rule, the ALJ further ruled that a genuine issue of fact remained as to whether "the pollutant levels set forth in the Fowler/Shakerag permit represent a necessary degradation of water quality based on

_____

[16] Ga. Comp. R. & Regs. r. 391-3-6-.03 (2) (b) (ii) (emphasis added).

9

an analysis of the technical and economic feasibility of alternative treatment levels, or whether such degradation is unnecessary." Thereafter, following the evidentiary hearing, the ALJ concluded that the permit's specific pollutant levels were not necessary.

We agree with the superior court that the ALJ erred as a matter of law in construing the anti-degradation rule in such a manner. Contrary to the ALJ's interpretation, the plain language of the rule only requires a determination of whether lower water quality *generally* is necessary to accommodate economic or social development. The language does not require a permit-specific analysis of whether the exact effluent limits for fecal coliform and phosphorus are necessary. In fact, such an interpretation renders Ga. Comp. R. & Regs. r. 391-3-6-.06, which specifically establishes numeric effluent limits for wastewater discharge, meaningless and should thus be avoided.[17] Rather, the proper interpretation of Ga. Comp. R. & Regs. r. 391-3-6-.03 (2) (b) (ii), which adheres to the rule's plain language and does not render Rule 391-3-6-.06 superfluous, is that it requires a determination as a threshold matter

---

[17] *See Ne. Ga. Cancer Care, LLC v. Blue Cross & Blue Shield of Ga.*, 315 Ga. App. 521, 526 (1) (a) (726 SE2d 714) (2012) (noting that this Court "must endeavor to give each part of the statute meaning and avoid constructions that make some language mere surplusage or meaningless" (punctuation omitted)).

10

whether any new or expanded discharge should be allowed into a high quality body of water. Given the rule's plain meaning, as well as the deference to be afforded to an agency's interpretation of its own rules, the superior court did not err in determining that the ALJ erroneously interpreted the Georgia anti-degradation rule.[18]

2. UCR contends that the superior court erred in treating EPD's 1997 guidance document regarding anti-degradation implementation procedures as if it was a Board-promulgated rule and in directing the ALJ to apply the procedures on remand. We agree.

In support of its contention that the superior court erroneously viewed the 1997 implementation procedures as rules, UCR notes, *inter alia*, that the court referred to those procedures as "codified." The County responds that the superior court's order demonstrated the court's awareness of the distinction between promulgated rules and internal agency procedures when it stated that "[t]he implementation procedures provided guidance to the EPD in the EPD's implementation of the rules." And both

---

[18] *See Walker*, 279 Ga. App. at 292-93 (2) (a).

the County and the EPD further argue that the court used the term "codify" to mean "to arrange or systematize" as opposed to "reduce to code."[19]

OCGA § 50-13-4 of the Georgia Administrative Procedure Act details the procedures an agency must follow in order to adopt new rules and regulations.[20] Failure to comply with these procedures will invalidate a rule.[21] And while statements concerning the internal management of an agency, which do not affect private rights, and statements of interpretations are not considered to be formal rules and are not subject to formal rulemaking procedures,[22] here, the superior court elevated the status of the implementation procedures to that of a formal rule when it held that "[t]he ALJ, on remand, shall apply the antidegradation review standard as codified in the EPD's implementing procedures . . . ." In doing so, despite the fact that those procedures were never promulgated pursuant to the requirements mandated by OCGA § 50-13-4,

---

[19] *See* THE COMPACT OXFORD ENGLISH DICTIONARY 281 (2d ed. 1991) (defining "codify" as, *inter alia*, "to reduce to a general system; to systematize").

[20] *See* OCGA § 50-13-4

[21] *See Walker*, 279 Ga. App. at 294 (2) (c).

[22] *See* OCGA § 50-13-2 (6) (D); *see also Ga. Oilmen's Ass'n v. Dep't of Revenue*, 261 Ga. App. 393, 400 (582 SE2d 549) (2003).

12

the superior court erred.[23] Accordingly, we reverse that aspect of the superior court's order.

3. UCR also contends that the superior court erred in failing to follow the Supreme Court of Georgia's controlling decision in *Hughey v. Gwinnett County*.[24] We disagree.

In *Hughey*, our Supreme Court interpreted the water quality anti-degradation rule as requiring that a permittee (1) show that degradation is necessary for social or economic development *and* (2) utilize the highest and best practicable level of wastewater treatment under existing technology.[25] However, in 2004 when *Hughey* was decided, the rule read as follows:

> Those waters in the State whose existing quality is better than the
> minimum levels established in standards on the date standards become

---

[23] *See Pruitt Corp. v. Ga. Dep't of Cmty. Health*, 284 Ga. 158, 160 (2) (664 SE2d 223) (2008) (holding that agency's interpretation of a term contained in an internal manual was not to be afforded deference because the manual was not a duly-enacted statute, rule, or regulation); *Ga. Dep't of Med. Assistance v. Beverly Enters.*, 261 Ga. 59, 60 (2) (401 SE2d 499) (1999) (holding that agency publication containing policies and procedures for nursing home services was not a "rule" as that term is defined by the Administrative Procedures Act); *see also* OCGA § 50-13-4.

[24] 278 Ga. 740 (609 SE2d 324) (2004).

[25] *Id*. at 742 (3).

effective will be maintained at high quality; with the State having the power to authorize new developments, when it has been affirmatively demonstrated to the State that a change is justifiable to provide necessary social or economic development; *and provided further that the level of treatment required is the highest and best practicable under existing technology* to protect existing beneficial water uses. Existing instream water uses and the level of water quality necessary to protect the existing uses shall be maintained and protected. All requirements in the Federal Regulations, 40 C.F.R. 131.12, will be achieved before lowering of water quality is allowed for high quality water.[26]

Dissatisfied with the outcome in *Hughey*, in November 2005 (nearly one year after our Supreme Court's decision was issued), the Georgia DNR, with U.S. EPA approval, amended the rule,[27] and the "highest and best practicable under existing technology" language, upon which the Supreme Court's decision relied,[28] was removed.[29] The *Hughey* decision, therefore, focused on a substantially different rule,

---

[26] Former Ga. Comp. R. & Regs. r. 391-3-6-.03 (2) (b) (2002) (emphasis added).

[27] *See* Former Ga. Comp. R. & Regs. r. 391-3-6-.03 (Amended Nov. 27, 2005).

[28] *See Hughey*, 278 Ga. at 743 (3) (b) (holding that "the ALJ's own factual findings contradict its conclusion that the permit properly required Gwinnett County to utilize the 'highest and best practicable level of treatment under existing technology.'" (punctuation omitted)).

[29] *See* Ga. Comp. R. & Regs. r. 391-3-6-.03 (2) (b) (ii).

and has little, if any, bearing on this matter. Accordingly, UCR's contention that the superior court erroneously ignored binding precedent from the Supreme Court of Georgia lacks merit.

4. Finally, UCR contends that the superior court erred in finding that the ALJ exceeded her authority by ordering the director of the EPD to revise the permit in accordance with wastewater-effluent limits indicated in the ALJ's final decision. Again, we disagree.

OCGA § 50-13-41 (b) provides in part that "[a]n administrative law judge shall have all the powers of the referring agency with respect to a contested case." Pursuant to OCGA § 50-13-2 (1), agency is defined "as each state board, bureau, commission, department, activity, or officer authorized by law expressly to make rules and regulations or to determine contested cases . . . ." And within Georgia's environmental statutory scheme, it is the Board of Natural Resources, and not the EPD or its director, that promulgates regulations and determines contested regulatory cases.[30] Given these circumstances, in challenges to the actions of the director of the EPD, the referring administrative agency is the Board of Natural Resources and not

---

[30] *See* OCGA § 12-5-23 (a) (1); OCGA § 12-5-31 (o) (1).

15

the EPD.[31] However, only the director of the EPD is authorized to issue NPDES permits. Accordingly, the ALJ exceeded her authority in ordering the director of the EPD to revise the permit limits.

*Judgment affirmed in part and reversed in part. Miller, P. J., and Ray, J., concur.*

---

[31] *See* OCGA § 12-2-2 (c) (2) (A) ("Any person who is aggrieved or adversely affected by any order or action of the director [of the EPD] shall, upon petition to the director within 30 days after the issuance of such order or the taking of such action, have a right to a hearing before an administrative law judge of the Office of State Administrative Hearings assigned under Code Section 50-13-40 and acting in place of the Board of Natural Resources.").