**FIRST DIVISION**
**BARNES, P. J.,**
**MCMILLIAN and MERCIER, JJ.**

**NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**February 27, 2018**

# In the Court of Appeals of Georgia

A17A1385. CRAIG BARROW, III v. RICHARD E. DUNN et al.

BARNES, Presiding Judge.

Craig Barrow, III appeals the superior court's judgment entered against him in this case, wherein he challenged the propriety of a permit issued by Georgia's Department of Natural Resources, Environmental Protection Division ("EPD") to the City of Guyton ("City") for a wastewater treatment facility. For reasons that follow, we reverse the judgment and remand the case for proceedings not inconsistent with this opinion.

On October 18, 2013, the EPD (acting through its Director[1]) issued a permit to the City, authorizing the City to build and operate a land application system facility ("LAS") upon a 265-acre tract of land located in Effingham County ("Site"). In connection therewith, wastewater collected in the City's sewer system would enter

---

[1] Since the permit was issued, (appellee) Richard E. Dunn has become the Director of the EPD.

the facility and undergo a series of treatments,[2] after which the treated wastewater would be applied to fields at the Site using spray irrigation. Approximately 44 acres of the Site will be devoted to sprayfield usage, and the sprayfield will operate up to five days each week.

The Site is bound on one side by a dirt road, across from which lies Barrow's 2,400-acre farm. (On the other side of Barrow's farm is the Ogeechee River.) Barrow uses his farm for pine forestry and recreation; he also promotes wildlife on his property by growing food plots for animals such as turkey and deer. One section of Barrow's farmland (that lies next to the dirt road) is comprised of wetlands that provide a habitat for, among other things, frogs, toads, salamanders, and turtles.

Complaining that surface water and groundwater traveling from the Site would pollute and degrade the waters on his property and harm the wetlands and various plant and animal life, Barrow administratively appealed the EPD's issuance of the permit.[3] Among the grounds asserted, Barrow claimed that the EPD had issued the

---

[2] See further footnote 13, infra.

[3] See OCGA § 12-2-2 (c) (2) (A) ("[A]ny person who is aggrieved or adversely affected by any order or action of the director shall . . . have a right to a hearing before an administrative law judge of the Office of State Administrative Hearings . . . acting in the place of the Board of Natural Resources.").

2

permit without complying with Georgia's antidegradation rule, Ga. Comp. R. & Regs. 391-3-6-.03 (2) (b). The EPD, and the City as intervenor, claimed that issuance of the permit was not in violation of the antidegradation rule, citing further internal EPD guidelines.

Following a determination that Barrow had standing, an administrative law judge (ALJ) conducted an evidentiary hearing on the merits.[4] Thereafter, the ALJ issued a final decision affirming the EPD's issuance of the permit based on her interpretation of the antidegradation rule. Barrow petitioned for judicial review, maintaining before the superior court that the EPD had issued the permit without compliance with the antidegradation rule. The superior court affirmed the ALJ's decision, concluding that issuance of the permit was lawful.

In this discretionary appeal, Barrow contends that the superior court erred in affirming the ALJ's decision.[5] In related claims of error, Barrow argues that the relevant part of the antidegradation rule is unambiguous; that the ALJ's and the superior court's interpretation of that rule contradicted the rule's plain language; and

---

[4] See Ga. Comp. R. & Regs. 616-1-2-.21 (1) (providing that the ALJ "shall make an independent determination on the basis of the competent evidence presented at the hearing").

[5] The City, as intervenor, has also filed an appellate brief, siding with the EPD.

that the EPD's cited guidelines provided no authority to avoid the clear mandates of that rule.

"[T]his Court conducts a de novo review of claimed errors of law in the superior court's appellate review of an ALJ's decision. Furthermore, the interpretation of a statute or regulation is a question of law and, thus, is also reviewed de novo on appeal." (Punctuation and footnotes omitted.) *Upper Chattahoochee Riverkeeper v. Forsyth County*, 318 Ga. App. 499, 502 (734 SE2d 242) (2012). With these guiding principles in mind, we review first the statutory scheme and rule at issue here.

Pursuant to the Federal Clean Water Act, the individual states are permitted to enact and administer their own water-quality programs, subject to certain federal minimum standards. See 33 USC § 1313; see also *Upper Chattahoochee Riverkeeper*, 318 Ga. App. at 502 (1). Toward that end, the Georgia Water Quality Control Act (Act), OCGA § 12-5-20 et seq., has as a central purpose the prevention of unnecessary degradation of current water quality. *Hughey v. Gwinnett County*, 278 Ga. 740, 742 (3) (609 SE2d 324) (2004) (interpreting OCGA § 12-5-21 (a), which declares the policy on the State's water resources).

Particularly pertinent here, OCGA § 12-5-30 (b) of the Act sets out:

4

Any person desiring to erect or modify facilities or commence or alter an operation of any type which will result in the discharge of pollutants[6] from a nonpoint source[7] into the waters of the state, which will render or is likely to render such waters harmful to the public health, safety, or welfare, or harmful or substantially less useful for domestic, municipal, industrial, agricultural, recreational, or other lawful uses, or for animals, birds, or aquatic life, *shall* obtain a permit from the director to make such discharge. . . . The director may, after public notice and opportunity for public hearing, issue a permit which authorizes the person to make such discharge upon condition that such discharge meets or will meet, pursuant to any schedule of compliance included in such permit, *all water quality standards*, effluent limitations, and all other requirements established pursuant to this article.[8]

---

[6] Under the Act, "'[p]ollutant' means dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt, industrial wastes, municipal waste, and agricultural waste discharged into the waters of the state." OCGA § 12-5-22 (9). See also OCGA § 12-5-22 (10) - (13).

[7] The Act defines "nonpoint source" as "any source which discharges pollutants into the waters of the state other than a point source." OCGA § 12-5-22 (5). The Act further defines "point source" as "any discernible, confined, or discrete conveyance, including, but not limited to, any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." OCGA § 12-5-22 (8). The ALJ found, and the parties agree, that the LAS is a "nonpoint source" of discharge.

[8] (Emphasis supplied.) In its brief, the EPD concedes, "In the case of an LAS, Georgia does require a permit which by its terms would be protective of the waters

5

(Emphasis supplied.)

Georgia's Board of Natural Resources is the agency responsible for promulgating rules and regulations governing the issuance of permits for constructing and operating facilities that discharge pollutants into Georgia's waters. See OCGA § 12-5-23 (a) (1) (C), (J).[9] And pursuant to that responsibility, the Board has promulgated a rule pertaining to the antidegradation of water-quality standards. Ga. Comp. R. & Regs. r. 391-3-6-.03. See *Upper Chattahoochee*, 318 Ga. App. at 503 (1).

The specific question presented to the ALJ that remains contested at this juncture is whether the EPD's issuance of the City's permit was in violation of Georgia's antidegradation rule. In relevant part, that rule provides:

> Where the quality of the waters exceed[s] levels necessary to support propagation of fish, shellfish, and wildlife and recreation in and on the water, that quality shall be maintained and protected *unless the division finds*, after full satisfaction of the intergovernmental coordination and public participation provisions of the division's continuing planning process, that allowing lower water quality *is necessary to accommodate important economic or social development in the area in which the waters are located*. In allowing such degradation or lower water quality,

of the state."

[9] See generally, e.g., OCGA §§ 12-5-29 (a), (b); 12-5-30.

6

the division shall assure water quality adequate to protect existing uses fully. Further, the division shall assure that there shall be achieved the highest statutory and regulatory requirements for all new and existing point sources and all cost-effective and reasonable best management practices for nonpoint source control.

(Emphasis supplied.) Ga. Comp. R. & Regs. 391-3-6-.03 (2) (b) (ii).[10] See Ga. Comp. R. & Regs. 391-3-9-.01 (2) (e) (defining "division" as "the Division of Environmental Protection of the Department of Natural Resources, State of Georgia").

Barrow argued below that, under the plain language of the antidegradation rule, a permit that allows the lowering of water quality requires that the EPD first find that such degrading of the water is "necessary to accommodate important economic or social development in the area in which the waters are located." Ga. Comp. R. & Regs. 391-3-6-.03 (2) (b) (ii). Barrow complained that the EPD failed to conduct the requisite antidegradation analysis in issuing the permit to the City, and consequently failed to make such mandatory finding.

In defending the issuance of the permit, the EPD and the City reminded the ALJ of principles such as:

---

[10] The parties do not dispute that the quality of the waters at issue here exceeds levels necessary to support propagation of fish, shellfish, and wildlife and recreation in and on the water.

7

> When an administrative agency decision is the subject of judicial review, judicial deference is to be afforded the agency's interpretation of statutes it is charged with enforcing or administering and the agency's interpretation of rules and regulations it has enacted to fulfill the function given it by the legislative branch.

*Pruitt Corp. v. Ga. Dept. of Community Health*, 284 Ga. 158, 159 (2) (664 SE2d 223) (2008). Additionally, they relied upon the EPD's Antidegradation Analysis Guidelines (the "Guidelines"). In particular, the EPD pointed out, while the Guidelines specified that the antidegradation analysis is triggered when a new or expanded *point source* discharge could degrade water quality, the Guidelines did *not* specify that an antidegradation analysis process is required for *nonpoint* source discharges (such as the LAS). Rather, the EPD and the City emphasized that the EPD's Guidelines expressly provided that "[a]n antidegradation analysis is *not* required for . . . Land Application Systems (LAS)." (Emphasis supplied.)

In upholding the permit, the ALJ interpreted the antidegradation rule as not requiring the EPD to undertake an antidegradation analysis for "nonpoint source" discharges such as the LAS. Such interpretation, the ALJ expressly reasoned, was consistent with explicit language cited in the EPD's Guidelines. In thus adopting the EPD's and the City's position, the ALJ quoted *Bentley v. Chastain*, 242 Ga. 348 (249

8

SE2d 38) (1978), for the proposition that "agencies provide a high level of expertise and an opportunity for specialization unavailable in the judicial or legislative branches." Id. at 350-351 (1).

We agree, however, with Barrow that the ALJ and the superior court erred as a matter of law in interpreting the antidegradation rule in such manner. The proper interpretation of the antidegradation rule, which adheres to its plain language, is that before a permit can be issued that allows lower water quality, the EPD must find that degradation of the water quality is necessary to accommodate important economic or social development in the relevant area. See Ga. Comp. R. & Regs. 391-3-6-.03 (2) (b) (ii). Notably, the antidegradation rule does not limit its application to point source discharges. And the Supreme Court of Georgia has already held that, pursuant to Georgia's antidegradation rule, a permit that will degrade the high quality of water cannot be granted unless the applicant meets substantive requirements, one of which is that the degradation be justifiable as "provid[ing] necessary social or economic development." (Punctuation and footnote omitted.) *Hughey v. Gwinnett County*, 278 Ga. 740, 742 (3) (609 SE2d 324) (2004).[11]

---

[11] As detailed in *Upper Chattahoochee*, 318 Ga. App. at 506 (3), a portion of the antidegradation rule was revised since *Hughey* was decided. That revision, however, is not implicated in this case.

9

Nothing in the cited EPD's internal Guidelines authorizes a conclusion contrary to the antidegradation rule's plain words or to *Hughey*'s holding. "[I]n construing administrative rules, the ultimate criterion is the administrative interpretation, which becomes of controlling weight *unless* it is plainly erroneous or inconsistent with the rule." (Citation and punctuation omitted; emphasis supplied.) *The Atlanta Journal & The Atlanta Constitution v. Babush*, 257 Ga. 790, 792 (2) (364 SE2d 560) (1988); see *Pruitt Corp.*, 284 Ga. at 159-160 (2) (explaining that it is erroneous for a superior court to give full "deference due a statute, rule or regulation to a term in a departmental manual, the terms of which ha[ve] not undergone the scrutiny afforded a statute during the legislative process or the adoption process through which all rules and regulations must pass"). Given the foregoing, the ALJ erroneously interpreted the antidegradation rule as inapplicable for the mere reason that the LAS was a nonpoint source of discharge.

Seeking affirmance of their favorable ruling(s) nonetheless, the EPD and the City posit that no antidegradation analysis was required in this case for an alternative reason. They cite evidence that, as planned, wastewater collected in the City's sewer

system and brought to the facility would first undergo a series of treatments,[12] next be sprayed upon designated fields at the Site, and finally percolate down through soil to allow cleansing by the natural process of absorption *before* ultimately seeping into the groundwater. Given such processes, the EPD and the City seemingly claim that the planned LAS facility will not discharge pollutants into the waters of the State in a harmful manner and thus OCGA § 12-5-30 (b)'s requirement that the discharge comply with "all water quality standards" is never triggered. And accordingly, the antidegradation rule never comes into play.

However, the ALJ did not affirm the permit on that alternative, evidentiary premise. Because the EPD's and the City's alternative argument was not ruled upon by the ALJ, it is not considered in this appeal. See generally *Ga. Bd. of Dentistry v.*

---

[12] Regarding such treatments, the ALJ found in her final decision (which findings the parties do not dispute):

> Upon arrival [at the Site's facility], the wastewater [from the City's sewer system] will first pass through screens that will remove solids. Next, it will move to aeration ponds, where bacteria will break down the organic waste. This treated wastewater . . . will then be transferred to storage ponds and eventually applied to fields at the Guyton site using spray irrigation.

11

*Pence*, 223 Ga. App. 603, 607 (5) (478 SE2d 437) (1996) (reiterating agency review as a prerequisite to judicial review).

For the reasons explained above, the ALJ's interpretation of the antidegradation rule amounted to plain error; the superior court's judgment affirming the ALJ's decision is thus reversed. This case is remanded for proceedings not inconsistent with this opinion.

*Judgment reversed and case remanded. McMillian and Mercier, JJ., concur.*