**THIRD DIVISION**
**ELLINGTON, P. J.,**
**RAY and BETHEL, JJ.**

**NOTICE: Motions for reconsideration must be _physically received_ in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**June 13, 2018**

# In the Court of Appeals of Georgia

A18A0594. ALTAMAHA RIVERKEEPER, INC. v. RAYONIER
PERFORMANCE FIBERS, LLC et al.

ELLINGTON, Presiding Judge.

This dispute arises from a National Pollutant Discharge Elimination System ("NPDES") permit issued in 2015 by the Environmental Protection Division ("EPD") of the Georgia Department of Natural Resources renewing appellee Rayonier Performance Fibers, LLC's ("Rayonier") authorization to discharge effluent into the Altamaha River from its pulp plant in Jesup. Appellant Altamaha Riverkeeper, Inc. ("Riverkeeper") filed in the Office of State Administrative Hearings a petition for a hearing asserting that it and its members had been adversely affected by the issuance of the permit. Following the hearing, the administrative law judge (the "ALJ") reversed the permit. Rayonier and Richard Dunn, in his capacity as the director of

EPD, sought judicial review of the ALJ's decision. The Superior Court of Wayne County reversed the ALJ's decision and affirmed the permit. Riverkeeper appeals following this Court's grant of its application for discretionary appeal and argues that the superior court erred (i) by interpreting Ga. Comp. R. & Regs. r. 391-3-6-.03 (5) (c) to prohibit only "unreasonable" interference with legitimate water uses and (ii) by making factual findings about the reasonableness of the interference instead of remanding the case to the ALJ to make factual findings consistent with its order. For reasons that follow, we affirm in part, vacate in part, and remand the case with direction.

The Federal Clean Water Act permits individual states to enact and administer their own water-quality programs, subject to certain federal minimum standards. See 33 USC §§ 1251, 1313; *Upper Chattahoochee Riverkeeper, Inc. v. Forsyth County*, 318 Ga. App. 499, 502 (1) (734 SE2d 242) (2012). Under the Georgia Water Quality Control Act, OCGA § 12-5-20 et seq. ("WCQA"), persons operating a facility that discharges a pollutant from a point source into the waters of the State must obtain an NPDES permit before any such discharge. OCGA § 12-5-30; *Upper Chattahoochee Riverkeeper, Inc. v. Forsyth County*, 318 Ga. App. at 502 (1). EPD administers the

2

NPDES program within the State. See OCGA § 12-5-23 (b) (3), (c) (15); OCGA § 12-5-30.

The Georgia Board of Natural Resources (the "Board") is responsible for issuing regulations governing, among other things, water use classifications and water quality standards. OCGA § 12-5-23 (a) (1) (C). Many water quality standards impose numeric limits for matters such as chemical constituents, bacteria, dissolved oxygen, and pH levels, among others.[1] The rules, however, also contain non-numerical "narrative standards" that address aesthetic concerns. At issue here is the narrative standard established by Ga. Comp. R. & Regs. r. 391-3-6-.03 (5) (c), which, at the relevant time, provided: "All waters shall be free from material related to municipal, industrial or other discharges which produce turbidity, color, odor or other objectionable conditions which interfere with legitimate water uses."

The ALJ interpreted the phrase "interfere with legitimate water uses" to mean "any interference" with such uses, and concluded that such standard applies to all waterways and for all legitimate uses, without exception and without consideration of the designated use of the waterway. The ALJ further concluded that, to show

---

[1] See, e.g., Ga. Comp. R. & Regs. rr. 391-3-6-.03 (5) (e) (i), (ii); 391-3-6-.03 (6) (a).

interference with legitimate water uses, the "use of the river [must be] actually hindered or disrupted." Applying that standard, the ALJ concluded that Rayonier's effluent has the reasonable potential to cause a violation of the narrative water standard for water and color. In particular, the ALJ found that the legitimate uses of the Altamaha, such as fishing or swimming or boating, are likely to be hindered during low flow due to aesthetic objections of local residents and visitors.[2]

On judicial review, the superior court found that the ALJ erred in interpreting the narrative standard. Finding EPD's interpretation of the standard to be reasonable and in accord with regulatory and statutory purposes, the superior court held that the narrative standard protected the use of waters from unreasonable interference, rather than any interference. The superior court further found that Rayonier's discharge does not unreasonably interfere with legitimate uses of the river and so reversed the ALJ's decision and affirmed the issuance of the permit.

---

[2] More specifically, the ALJ found that "during low flow conditions, the color of the discharge is still distinct from the river water, creating a plume of color that travels along the bank for some distance, and that the unpleasant odor of the effluent is less diluted and more pronounced under such conditions."

1. The Appellant contends that the superior court erred in interpreting Ga. Comp. R. & Regs. r. 391-3-6-.03 (5) (c) to prohibit only "unreasonable" interference with legitimate water uses. In reviewing an administrative agency's decision, the "court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact." OCGA § 50-13-19 (h). See OCGA § 12-5-44 (a) (proceedings for judicial review of administrative decisions under the WCQA shall be in accordance with OCGA § 50-13-19). The superior court may, however, reverse or modify the agency decision

> if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) In violation of constitutional or statutory provisions; (2) In excess of the statutory authority of the agency; (3) Made upon unlawful procedure; (4) Affected by other error of law; (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

OCGA § 50-13-19 (h).

On appeal from the superior court's decision in an administrative appeal, this Court's "duty is not to review whether the record supports the superior court's decision but whether the record supports the final decision of the administrative

5

agency." (Citation and punctuation omitted.) *Quigg v. Ga. Professional Standards Comm.*, 344 Ga. App. 142, 148 (809 SE2d 267) (2017). In this case, the ALJ's final order constituted the final agency decision for purposes of judicial review. See Ga. Comp. R. & Regs. r. 391-1-2-.08. "[T]his Court conducts a de novo review of claimed errors of law in the superior court's appellate review of an ALJ's decision. Furthermore, the interpretation of a statute or regulation is a question of law and, thus, is also reviewed de novo on appeal." (Citation and punctuation omitted.) *Barrow v. Dunn*, 344 Ga. App. 747, 749 (812 SE2d 63) (2018).

At issue is the correct interpretation of the narrative standard, particularly the phrase "interferes with legitimate water uses."

> In construing agency regulations, we employ the basic rules of statutory construction and look to the plain language of the regulation to determine its meaning. Nevertheless, even if words are apparently plain in meaning, they must not be read in isolation and instead, must be read in the context of the regulation as a whole. Furthermore, we must defer to an agency's interpretation and enforcement of its own rules.

(Punctuation and footnotes omitted.) *Upper Chattahoochee Riverkeeper, Inc. v. Forsyth County*, 318 Ga. App. at 502 (1).

6

We read the text of the narrative standard "in its most natural and reasonable way, as an ordinary speaker of the English language would." (Citation and punctuation omitted.) *Tibbles v. Teachers Retirement System of Ga.*, 297 Ga. 557, 558 (1) (775 SE2d 527) (2015). "Interfere" is not defined in the rules governing water use standards.[3] However, "interfere" can be generally defined as "to check; hamper; hinder; infringe; encroach; trespass; disturb; intervene; intermeddle; interpose." *Huckaby v. Cheatham*, 272 Ga. App. 746, 751 (1) (612 SE2d 810) (2005) (punctuation omitted; quoting Black's Law Dictionary (5th ed. 1979), p. 730). As used in the regulation, a "legitimate" use encompasses a broad range of water uses. In particular, the definition of "reasonable and necessary uses" of water include "drinking water supplies, conservation, protection, and propagation of fish, shellfish, wildlife and other beneficial aquatic life, agricultural, industrial, recreational, and *other legitimate uses*." (Emphasis supplied.) Ga. Comp. R. & Regs. r. 391-3-6-.03 (3) (j).

---

[3]Although not defined within Rule 391-3-6-.03, the Board has defined "interference" or "interfere" within Rule 391-3-6-.08, a water quality control rule addressing pretreatment of permits for discharge of any pollutant into a publicly owned treatment works, to constitute a "discharge which . . . inhibits or disrupts" a publicly owned treatment works. Ga. Comp. R. & Regs. r. 391-3-6-.08 (2) (j).

"The common and customary usages of the words are important, but so is their context." (Citations omitted.) *Chan v. Ellis*, 296 Ga. 838, 839 (1) (770 SE2d 851) (2015). Accordingly, in construing the meaning of narrative standard we also look to the WCQA and the regulation as a whole. The policy of the State, as expressed in the WQCA, is that "the water resources of the state shall be utilized prudently for the maximum benefit of the people" and "to require where necessary reasonable usage of the waters of the state and reasonable treatment of sewage, industrial wastes, and other wastes prior to their discharge into such waters." OCGA § 12-5-21 (a). In turn, according to the regulations, the purpose of the State in establishing water quality standards is, among other things, "to protect the public health or welfare in accordance with the public interest for drinking water supplies, conservation of fish, wildlife and other beneficial aquatic life, and agricultural, industrial, recreational, and other reasonable and necessary uses[.]"[4]

The regulations establishing water quality standards include "general criteria,"[5] which apply to all waters, and "specific criteria,"[6] which impose standards based on

_____

[4] Ga. Comp. R. & Regs. r. 391-3-6-.03 (2) (a).

[5] Ga. Comp. R. & Regs. r. 391-3-6-.03 (5).

[6] Ga. Comp. R. & Regs. r. 391-3-6-.03 (6).

8

water use classification, also known as "designated use,"[7] which uses include drinking water supplies, recreation, fishing, wild river, scenic river, and coastal fishing.[8] At the location of Rayonier's discharge, the designated use of the Altamaha is "fishing," which has the most relaxed water criteria and provides for propagation of aquatic life, secondary contact recreation,[9] and "any other use requiring water of a lower quality."[10] The narrative standard at issue in this case is a general criterion, and as such "is deemed to be necessary and applicable to all waters of the State."[11] The specific criteria based on designated uses are "in addition to the general criteria."[12] The narrative standard does not contain a drought or low flow exception.

In addition to the plain language of the narrative standard and its context in the regulation as a whole, we consider EPD's interpretation of the standard. A "reviewing

---

[7] The Clean Water Act contemplates that States adopt water quality standards based on the "designated uses" of navigable waters as well as water quality criteria based on such uses. 33 USC § 1313 (c) (2) (A).

[8] Ga. Comp. R. & Regs. r. 391-3-6-.03 (4).

[9] "Secondary contact recreation" constitutes "incidental contact with the water, wading, and occasional swimming." Ga. Comp. R. & Regs. r. 391-3-6-.03 (3) (k).

[10] See Ga. Comp. R. & Regs. ¶. 391-3-6-03 (6) (c) and 391-3-6-.03 (14).

[11] Ga. Comp. R. & Regs. r. 391-3-6-.03 (5).

[12] Ga. Comp. R. & Regs. r. 391-3-6-.03 (6).

court must give deference to the agency's interpretation of statutes it is charged with enforcing or administering and to the agency's own rules and regulations." *Northeast Ga. Med. Center, Inc. v. Winder HMA, Inc.*, 303 Ga. App. 50, 56 (2) (b) (693 SE2d 110) (2010). In construing an administrative rule, "the ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the rule." (Citation and punctuation omitted.) *The Atlanta Journal &c. v. Babush*, 257 Ga. 790, 792 (2) (364 SE2d 560) (1988). See *Northeast Ga. Med. Center., Inc. v. Winder HMA, Inc.*, 303 Ga. App. at 57 (2) (accord). The ALJ acknowledged that EPD's interpretation of the narrative standard was explained through testimony at the hearing. Consistently with that testimony, the ALJ, in pertinent part, described EPD's interpretation as follows:

> [T]hese [narrative water quality] standards must be considered in the context of the particular water's "designated use." [T]he narrative water quality standards do not require that all people get to use all sections of every waterbody at all times. Rather, for multi-use bodies of water, like the Altamaha, there must be a reasonable accommodation of all legitimate uses, including industrial discharges. This section of the Altamaha's designated use is fishing, the lowest designation in terms of water quality, and the narrative standard should not be interpreted to convert the designated use to some higher use.

The narrative standard addresses a broad range of aesthetic concerns, including "any objectionable conditions," which cannot "interfere" with another broad category, "legitimate water uses." To "interfere" with a use may encompass a varying degree of conduct. The scope of the narrative standard, even when considered in the context of the regulation as a whole, is unclear. The EPD's interpretation of the rule is not inconsistent with the WCQA and the regulatory scheme. The policy of the State is that its water resources be used for the maximum benefit of the people. OCGA § 12-5-21 (a). It is consistent with the WCQA and the regulations governing water use that interference with legitimate water uses be assessed by interference with the public's use of the water, and not by reference to any one or a small group of persons whose own aesthetic sensibilities might hinder their personal use of the river. In other words, the EPD could reasonably conclude, as it did, that the narrative standard does not require that "all people get to use all sections of every waterbody at all times." It is also a fundamental rule of statutory construction "to avoid a construction that makes some language mere surplusage." (Citation and punctuation omitted.) *Lyman v. Cellchem International, Inc.*, 300 Ga. 475, 477 (796 SE2d 255) (2017). Thus, it was proper for the EPD to interpret the narrative standard as not intended to convert the

11

designated use of a water body to a more protected use. Finally, the plain language of the narrative standard does not specify the degree of interference with legitimate water uses that would constitute a violation of the rule. The DCH's interpretation of the rule as encompassing a reasonableness standard in assessing a violation, as opposed to the ALJ's finding that the rule precludes "any" interference, avoids unreasonably absolute and therefore potentially absurd applications of the rule.

Riverkeeper asserts that the EPD's interpretation of the narrative standard is nothing more than a convenient litigating position and should not be afforded deference. In the federal context, deference to an agency's interpretation is

> unwarranted when there is reason to suspect that the agency's interpretation does not reflect the agency's fair and considered judgment on the matter in question. This might occur when the agency's interpretation conflicts with a prior interpretation, or when it appears that the interpretation is nothing more than a convenient litigating position, or a post hoc rationalization advanced by an agency seeking to defend past agency action against attack.

(Citation and punctuation omitted.) *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (II) (A) (132 SCt 2156, 183 LE2d 153) (2012). While we find this reasoning persuasive, Riverkeeper does not show that the offered testimony was not the EPD's fair and considered judgment. See *Auer v. Robbins*, 519 U.S. 452, 462 (III)

12

(B) (117 SCt 905, 137 LE2d 79) (1997) (even though agency interpretation came in form of legal brief, there was no reason to suspect it did not constitute the agency's fair and considered judgment). Riverkeeper does not point to anything in the record indicating that EPD has taken an inconsistent position in the past. The interpretation was advanced during the administrative proceedings, and not afterwards. See *Martin v. Occupational Safety and Health Review Comm.*, 499 U.S. 144, 154-156 (111 SCt 1171, 113 LE2d 117) (1991) (interpretation of regulation during administrative adjudication was agency action, not a *post hoc* rationalization of it). The Board's amendment to the narrative standard during the course of this appeal is also consistent with the interpretation of the narrative standard offered by EPD during the hearing.[13] We conclude, therefore, that the EPD's interpretation of the narrative standard was entitled to deference. The superior court did not err, as alleged by Riverkeeper, in

---

[13] During the pendency of this appeal, it is undisputed that the Board amended the narrative standard to provide: "All waters shall be free from material related to municipal, industrial or other discharges which produce turbidity, color, odor or other objectionable conditions which unreasonably interfere with the designated use of the water body." The express purpose of the amendment was to "clarify the current language." See *Jackson v. Delk*, 257 Ga. 541, 543 (3) (361 SE2d 370) (1987) (considering "clarification" by a zoning board of its decision during the pendency of the appeal). It appears from the parties' supplemental briefing that the amendment to the regulation has been formally adopted by the Board and nothing remains to be done at the state level, but that the revised rule remains subject to EPA approval.

13

concluding that the narrative standard prohibits "unreasonable" interference with legitimate water uses.

2. Riverkeeper also contends that the superior court erred by making factual findings about the reasonableness of the interference, instead of remanding the case to the ALJ to make findings consistent with its order. In reversing the ALJ's decision, the superior court concluded that the ALJ's "findings regarding extensive use of [the subject] portion of the river for fishing and recreation establish that Rayonier's discharge does not unreasonably interfere with legitimate uses of the river so as to violate the narrative water quality standard." Accordingly, the superior court reversed the ALJ's decision and affirmed the issuance of the NPDES permit.

Where a judgment is rendered under an erroneous theory of law, an appellate court must generally reverse and remand for reconsideration under the correct theory of law. See *Southeastern Aluminum Recycling, Inc. v. Rayburn*, 172 Ga. App. 648, 650 (2) (324 SE2d 194) (1984) (requiring that case be reconsidered by the ALJ). And in its appellate review, the superior court was not authorized to "substitute its judgment for that of the agency as to the weight of the evidence on questions of fact." OCGA § 50-13-19 (h). Compare, e. g., *Bonus Stores, Inc. v. Hensley*, 309 Ga. App. 129, 132 (710 SE2d 201) (2011) (the appellate division of the Workers'

14

Compensation Board weighs evidence heard by the ALJ, unlike the superior court). Much of the evidence, such as the duration and frequency of low flow events, would need to be considered anew in assessing whether the interference with legitimate water uses was unreasonable, as opposed to whether there was any interference. We cannot say what the ALJ would have concluded had she applied the correct standard. See *Southeastern Aluminum Recycling, Inc. v. Rayburn*, 172 Ga. App. at 650 (2). Accordingly, we vacate the order of the superior court to the extent that it affirms the issuance of the NPDES permit and remand with direction that the superior court in turn remand the case to the ALJ for reconsideration in light of this opinion. See id.

*Judgment affirmed in part and vacated in part, and case remanded with direction. Ray, J., concurs. Bethel, J., concurs specially in Division 1 and dissents in Division 2.\**

**\*THIS OPINION IS PHYSICAL PRECEDENT ONLY. COURT OF APPEALS RULE 33.2 (a).**

A18A0594. ALTAMAHA RIVERKEEPER, INC. v. RAYONIER

PERFORMANCE FIBERS, LLC., et al.

BETHEL, Judge, concurring specially in part and dissenting in part.

I concur that the EPD's interpretation of its own narrative standard[1] was lawful

and entitled to deference in the context of the Act and the entirety of the regulatory

structure. Moreover, I agree with the superior court that the ALJ's findings of fact are

thorough and more than sufficient to obviate the need for remand for further fact

finding. I, likewise, agree with the superior court that those findings of fact support

---

[1]Of course, citizens and other stakeholders would benefit from clear statements that reflected the actual intent of the regulator as opposed to broad aspirational statements that, though adopted as standards, are not consistent with the regulator's actual intent to enforce. Nevertheless, as explained by the Presiding Judge, the agency's interpretation is entitled to deference.

the legal conclusion that the interference in question was not unreasonable. Accordingly, I concur specially with Division 1 and I respectfully dissent from Division 2.