305 Ga. 799
FINAL COPY

S18G0944. CITY OF GUYTON v. BARROW.
S18G0945. DUNN v. BARROW.

PETERSON, Justice.

At the core of the judicial power is the authority and responsibility to interpret legal text. We have many tools that aid us in this task. When we find the text of a statute ambiguous, nearly a century of Georgia case law instructs us to defer to the interpretation of the state agency charged with administering the statute. More recently, we decided that agency interpretations of their own regulations should be afforded the same deference. Some have argued that this doctrine is in tension with our role as the principal interpreter of Georgia law, and we granted certiorari here on that question. But any such tension could exist only in cases where we have exhausted all of our interpretive tools without determining a text's meaning. This is not one of those cases.

At issue in this case is whether the Environmental Protection Division of the Georgia Department of Natural Resources ("EPD") properly issued a permit to the City of Guyton to build and operate a land application system ("LAS") that would apply treated wastewater to a tract of land through spray irrigation. Craig Barrow III challenged the issuance of that permit, arguing that, among other things, EPD issued the permit in violation of a water quality standard, Ga. Comp. R. & Regs. r. 391-3-6-.03 (2) (b) (ii) (the "antidegradation rule"), because it failed to determine whether any resulting degradation of water quality in the State waters surrounding the proposed LAS was necessary to accommodate important economic or social development in the area. An administrative law judge ("ALJ") rejected Barrow's argument, finding that the rule required an antidegradation analysis only for point source discharges of pollutants and the LAS at issue was a nonpoint source discharge. The superior court affirmed the administrative ruling. The Court of Appeals reversed, concluding that the plain language of the antidegradation rule required EPD to

perform the antidegradation analysis for nonpoint source discharges, and that EPD's internal guidelines to the contrary did not warrant deference. See *Barrow v. Dunn*, 344 Ga. App. 747 (812 SE2d 63) (2018).

We granted certiorari in this case to consider what level of deference courts should afford EPD's interpretation of the antidegradation rule, and whether that regulation requires an antidegradation analysis for nonpoint source discharges. We conclude that the Court of Appeals was correct that the antidegradation rule is unambiguous, and, therefore, we do not answer the first question, which matters only when a regulation is ambiguous. But the Court of Appeals erred in its interpretation of the regulation. The text and legal context of the regulation show that an antidegradation analysis is required only for point sources, not nonpoint sources. Therefore, we reverse.

1. *An overview of the City's LAS permit.*

In 2011, the City applied for a permit for the LAS as part of a plan to construct a municipal wastewater treatment facility on a

tract of land in Effingham County. Under the City's proposal, wastewater that has been treated to remove solids and break down organic waste would be applied by spray irrigation to a portion of that tract of land, which would be covered with vegetation in order to absorb the treated wastewater. EPD issued a permit to the City in 2013, authorizing the City to build and operate the LAS. The permit placed a number of restrictions on the operation of the LAS: a prohibition on irrigation if conditions would permit runoff and discharge outside the sprayfield; establishment of buffer zones between the sprayfield and wetlands; a requirement that the groundwater leaving the boundaries of the facility must not exceed the maximum contaminant levels for drinking water; and a maximum application rate of 0.25 inches per hour and 1.61 inches per week, which was more restrictive than the general ceiling of 2.5 inches per week for a typical LAS. The permit also required the City to conduct a watershed assessment to determine baseline water quality, develop a watershed protection plan, and issue periodic

reports outlining stream data and verifying that the watershed protection plan was being implemented.

Barrow owns land across the road from the tract of land that contains the City's proposed LAS. He challenged the issuance of the City's permit, alleging that the City's operations would harm aquatic species in the wetlands on his property. Barrow specifically challenged the issuance of the permit on the basis that EPD failed to conduct an antidegradation analysis prior to issuing the permit. After several hearings, the ALJ concluded that the permit was lawful and that the City's LAS did not require an antidegradation analysis because it was a nonpoint source discharge.[1] Barrow sought review before the superior court, which affirmed the ALJ's ruling.

Barrow appealed to the Court of Appeals, which reversed on the basis that EPD was required to conduct an antidegradation analysis before issuing the LAS permit. In reaching this conclusion, the Court of Appeals noted that it was undisputed that the LAS was

---

[1] The ALJ rejected Barrow's other challenges to the permit, but those issues are not before us.

a nonpoint source discharge and that nonpoint source discharges require a permit, and determined that the plain language of the antidegradation rule requires EPD to conduct an antidegradation analysis before issuing any permit that allows for the lowering of water quality. *Barrow*, 344 Ga. App. at 749-753. The Court of Appeals also rejected EPD's interpretation of the antidegradation rule — that it — applied only to point source discharges — because the agency's interpretation was inconsistent with the plain language of the rule. Id. at 752-753.

We granted the City's and EPD's petitions for certiorari, directing the parties to address questions of deference to agency interpretations and whether the Court of Appeals erred in concluding that an antidegradation analysis was required for the City's LAS. We first explain why we need not resolve the question of whether we should defer to EPD's interpretation of the antidegradation rule, before turning to the meaning of the rule itself. After reviewing the text of the rule within its applicable legal context, we conclude that the antidegradation rule did not require

EPD to perform an antidegradation analysis before issuing the permit to the City, and therefore reverse the Court of Appeals.

2. *It is unnecessary to decide the question of judicial deference in this case.*

More than 30 years ago in *The Atlanta Journal &The Atlanta Constitution v. Babush*, 257 Ga. 790, 792 (2) (364 SE2d 560) (1988), we imported to Georgia the United States Supreme Court's jurisprudence on judicial deference to agency interpretations of regulations that has become known as *Auer* or *Seminole Rock* deference. See *Auer v. Robbins*, 519 U. S. 452, 461 (117 SCt 905, 137 LE2d 79) (1997) (agency's interpretation of its own regulation is "controlling unless plainly erroneous or inconsistent with the regulation" (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U. S. 410, 414 (65 SCt 1215, 89 LE 1700) (1945) (punctuation omitted))). In recent years, the validity of *Auer*/*Seminole Rock* deference has been strongly criticized. See, e.g., *Decker v. Northwest Environmental Defense Center*, 568 U. S. 597, 615-616 (133 SCt 1326, 185 LE2d 447) (2013) (Roberts, C.J., joined by Alito, J.,

concurring) ("The bar is now aware that there is some interest in reconsidering [*Seminole Rock* and *Auer*]. . . . I would await a case in which the issue is properly raised and argued."); id. at 616-621 (Scalia, J., concurring in part and dissenting in part) ("For decades, and for no good reason, we have been giving agencies the authority to say what their rules mean, under the harmless-sounding banner of . . . *Seminole Rock* or *Auer* deference."); *Talk America, Inc. v. Michigan Bell Tel. Co.*, 564 U. S. 50, 67-69 (131 SCt 2254, 180 LE2d 96) (2011) (Scalia, J., concurring) (noting inclination to reconsider *Auer* in a case where properly raised). The United States Supreme Court has now granted certiorari to revisit its *Auer/Seminole Rock* precedent. See *Kisor v. Wilkie*, No. 18-15.[2]

Our statement in *Atlanta Journal* that an agency's interpretation is "controlling"[3] unless "it is plainly erroneous or

---

[2] The State of Georgia has joined an amicus brief in *Kisor* that supports overruling *Auer* and *Seminole Rock*.

[3] This type of deference is stronger than so-called *Skidmore* deference, where an agency's interpretation is "entitled to respect to the extent it has the power to persuade the reviewing court." See *Cook v. Glover*, 295 Ga. 495, 502 (761 SE2d 267) (2014) (Nahmias, J., concurring) (citations and punctuation omitted).

inconsistent" with the regulation seemingly requires us to follow an agency interpretation so long as it is reasonable. See 257 Ga. at 792 (2). Although our statement in *Atlanta Journal* placed no qualifiers on judicial deference to agency interpretations, it is clear that we are to defer to an agency's interpretation only when we are unable to determine the meaning of the legal text at issue. See *Christensen v. Harris County*, 529 U. S. 576, 588 (120 SCt 1655, 146 LE2d 621) (2000) ("*Auer* deference is warranted only when the language of the regulation is ambiguous."). Our case law predating *Atlanta Journal* made that clear. Prior to *Atlanta Journal*, our long-held rule in interpreting statutes was that courts were to defer to an agency's construction only in cases where the meaning of a statute was ambiguous. See, e.g., *Suttles v. Northwestern Mut. Life Ins. Co.*, 193 Ga. 495, 515 (4) (19 SE2d 396) (1942) (a "[reasonable] administrative interpretation and practice, continued for a long period, should be accepted as controlling . . . only when the law is ambiguous and susceptible of different interpretations"); *Elder v. Home Building & Loan Assn.,* 188 Ga. 113, 116 (2) (3 SE2d 75) (1939) ("[W]here the

invalidity of a statute is doubtful, [an agency's interpretation] has much weight with the court in determining its validity[.]"); *Standard Oil Co. of Kentucky v. State Revenue Commission*, 179 Ga. 371, 376 (176 SE 1) (1934) ("The rulings of departmental and executive officers are at best persuasive, and may be of great force in cases of doubt[, and] . . . should be restricted to cases in which the meaning of the statute is really doubtful[.]" (citation and punctuation omitted)).[4] This long-held rule has survived *Atlanta Journal*. See, e.g., *New Cingular Wireless PCS, LLC v. Ga. Dept. of Revenue*, 303 Ga. 468, 471-473 (2) (813 SE2d 388) (2018) (applying rule in construing regulation); *Tibbles v. Teachers Retirement Sys. of Ga.*, 297 Ga. 557, 558-559 (1) (775 SE2d 527) (2015) (applying rule in construction of statute).

---

[4] This approach is similar to the *Chevron* deference applicable to federal statutes. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U. S. 837, 843-845 (104 SCt 2778, 81 LE2d 694) (1984) (a reviewing court must defer to an agency's interpretation of ambiguous statute so long as it is reasonable); see also *Tibbles v. Teachers Retirement Sys. of Ga.*, 297 Ga. 557, 559 (1) n.2 (775 SE2d 527) (2015) (noting that our approach closely resembles *Chevron*).

We may conclude that an ambiguity exists, however, only after we have exhausted all tools of construction. See *New Cingular Wireless*, 303 Ga. at 471-472 (2) (using rules of statutory construction to construe regulation before concluding that, if any ambiguity existed, the agency's interpretation was unreasonable); see also *Epic Systems Corp. v. Lewis*, ___ U. S. ___, ___ (138 SCt 1612, 200 LE2d 889) (2018) ("[D]eference is not due unless a court, employing traditional tools of statutory construction, is left with an unresolved ambiguity." (citation and punctuation omitted)). A significant criticism of *Auer*/*Seminole Rock* deference is that courts, faced with the task of interpreting difficult agency regulations, are often too eager to sidestep the obligation of discerning what the law is. See *Pereira v. Sessions*, ___ U. S. ___, ___ (138 SCt 2105, 201 LE2d 433) (2018) (Kennedy, J., concurring) (finding troubling lower courts' "cursory" application of rules of construction in interpreting immigration statute and their "reflexive deference" to agency interpretations); *Perez v. Mortgage Bankers Assn.*, ___ U. S. ___, ___ (135 SCt 1199, 191 LE2d 186) (2015) (Thomas, J., concurring in the

judgment) ("[T]he Judiciary has a responsibility to decide cases properly before it, even those it would gladly avoid . . . . But we have not consistently exercised the judicial check with respect to administrative agencies." (citations and punctuation omitted)). A statute or regulation is not ambiguous merely because interpreting it is hard. See *Pauley v. BethEnergy Mines, Inc.*, 501 U. S. 680, 706 (111 SCt 2524, 115 LE2d 604) (1991) (Scalia, J., dissenting) ("*Chevron* is a recognition that the ambiguities in statutes are to be resolved by the agencies charged with implementing them, not a declaration that, when statutory construction becomes difficult, we will throw up our hands and let regulatory agencies do it for us.").

After using all tools of construction, there are few statutes or regulations that are truly ambiguous. And here, although the meaning of the applicable regulation is not obvious on its face, this does not mean the regulation is ambiguous. We explain below why the antidegradation rule is unambiguous given the legal context from which the rule developed. Because the rule is not ambiguous,

we do not reach the question of whether deference is appropriate in the case of true ambiguity.

*3. Georgia's antidegradation rule does not require an antidegradation analysis for nonpoint sources.*

At the center of the dispute in this case is EPD's antidegradation rule, which, at the time EPD issued a permit to the City, provided:

> Where the quality of the waters exceeds levels necessary to support propagation of fish, shellfish, and wildlife and recreation in and on the water, that quality shall be maintained and protected unless [EPD] finds, after full satisfaction of the intergovernmental coordination and public participation provisions of [EPD's] continuing planning process, that allowing lower water quality is necessary to accommodate important economic or social development in the area in which the waters are located. In allowing such degradation or lower water quality, [EPD] shall assure water quality adequate to protect existing uses fully. Further, [EPD] shall assure that there shall be achieved the highest statutory and regulatory requirements for all new and existing point sources and all cost-effective and reasonable best management practices for nonpoint source control.

Ga. Comp. R. & Regs. r. 391-3-6-.03 (2) (b) (ii) (2011).[5] The parties agree that the rule is unambiguous, but offer diametrically opposite interpretations of its meaning. EPD argues that the rule's context informs its meaning and shows that an antidegradation analysis is not required for nonpoint sources. Barrow, on the other hand, argues that the unambiguous text of the rule refers to both point and nonpoint sources, and that, therefore, an antidegradation analysis was required for the City's LAS.

At first blush, one might read Georgia's antidegradation rule to require an antidegradation analysis for both point and nonpoint sources, as it discusses both sources of discharge. See Ga. Comp. R. & Regs. r. 391-3-6-.03 (2) (b) (ii). But a closer inspection of the rule, and an understanding of the legal context in which the rule was created, shows that it applies only to point sources.

---

[5] In its brief, EPD notes that an additional provision was added to the antidegradation rule in 2018 as part of the Board of Natural Resources' triennial review of water quality standards. We do not consider this additional language because it was not effective at the time EPD issued the permit in this case. In any case, this provision sheds no light on whether an antidegradation analysis is required for nonpoint sources.

As we have said many times before when interpreting legal text, "we do not read words in isolation, but rather in context." *Smith v. Ellis,* 291 Ga. 566, 573 (3) (a) (731 SE2d 731) (2012). The primary determinant of a text's meaning is its context, which includes the structure and history of the text and the broader context in which that text was enacted, including statutory and decisional law that forms the legal background of the written text. See *Undisclosed LLC v. State*, 302 Ga. 418, 420 (2) (a) (807 SE2d 393) (2017); *Olevik v. State*, 302 Ga. 228, 235-236 (2) (c) (i) (806 SE2d 505) (2017); *Deal v. Coleman*, 294 Ga. 170, 172-173 (1) (a) (751 SE2d 337) (2013). This principle, and other rules of statutory construction, apply to all positive legal rules, including agency regulations. See *Ga. Dept. of Community Health v. Northside Hosp.*, 295 Ga. 446, 450 (761 SE2d 74) (2014) (applying rules of statutory construction to conclude that "the final sentence of [a regulation] cannot be read in isolation from the other language contained in it" (citation omitted)); see also *Undisclosed*, 302 Ga. at 428 (2) (b) (explaining that "[w]e interpret court rules in the same manner we interpret other written

instruments," which includes the context in which the written instrument was enacted). Thus, "[e]ven if words are apparently plain in meaning, they must not be read in isolation and instead, must be read in the context of the regulation as a whole." *Elliott v. State*, 305 Ga. 179, 187 (II) (B) (824 SE2d 265) (2019) (quoting *Upper Chattahoochee Riverkeeper, Inc. v. Forsyth County*, 318 Ga. App. 499, 502 (1) (734 SE2d 242) (2012) (punctuation omitted)); see also *Brown v. Gardner*, 513 U. S. 115, 118 (115 SCt 552, 130 LE2d 462) (1994) ("Ambiguity is a creature not of definitional possibilities but of statutory context[.]").

(a) *The legal context of EPD's antidegradation rule.*

The antidegradation rule at issue is part of a comprehensive regulatory framework, both federal and state, to limit the discharge of pollutants into the waters of the United States and Georgia. The primary governing authority in this context is the federal Clean Water Act ("CWA") (33 USC § 1251 et seq.). See *South Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U. S. 95, 102 (124 SCt 1537, 158 LE2d 264) (2004). The CWA protects water quality

through two measures. First, the CWA authorizes the federal Environmental Protection Agency ("EPA") to establish "effluent limitations" to restrict the quantity, rate, and concentration of specified substances from point sources. See *Arkansas v. Oklahoma*, 503 U. S. 91, 101 (112 SCt 1046, 117 LE2d 239) (1992) (citing 33 USC §§ 1311, 1314). Second, the CWA also requires states to establish "water quality standards" for all waters within their boundaries. See id. (citing 33 USC § 1313); *Pronsolino v. Nastri*, 291 F3d 1123, 1127 (9th Cir. 2002).

The CWA enforces these effluent limitations and water quality standards by making it unlawful to discharge any pollutant through a point source without a permit issued under the National Pollutant Discharge Elimination System ("NPDES"). *Arkansas*, 503 U. S. at 101-102. Georgia, as do most states, administers the NPDES program within its borders subject to EPA oversight of the permit-issuing procedures. See OCGA § 12-5-23 (a) (5) (A), (c) (15); see also *Sierra Club v. Meiburg*, 296 F3d 1021, 1024 (11th Cir. 2002);

*Altamaha Riverkeeper, Inc. v. Rayonier Performance Fibers, LLC*, 346 Ga. App. 269, 270 (816 SE2d 125) (2018).

By its very terms, the CWA regulates only the discharge from a point source, which is defined as "any discernible, confined and discrete conveyance," such as a pipe, ditch, channel, or tunnel. *Meiburg*, 296 F3d at 1024-1025; Id. (citing 33 USC § 1362 (12), (14)); *Simsbury-Avon Preservation Society, LLC v. Metacon Gun Club, Inc.*, 575 F3d 199, 219 (2d Cir. 2009). The CWA does not regulate nonpoint source pollution of water bodies caused by "diffuse land use activities . . . enter[ing] the waters primarily through indiscrete and less identifiable natural processes such as runoffs, precipitation and percolation." *Simsbury-Avon Preservation Society*, 575 F3d at 219-220 (citation and punctuation omitted); see also *Kentucky Waterways Alliance v. Kentucky Utilities Co.*, 905 F3d 925, 933 (6th Cir. 2018); *Defenders of Wildlife v. U. S. Environmental Protection Agency*, 415 F3d 1121, 1124-1125 (10th Cir. 2005); *Meiburg*, 296 F3d at 1024. The regulation of nonpoint sources is left to the states. See *Simsbury-Avon Preservation Society*, 575 F3d at 219-220.

Although nonpoint sources are not regulated by the CWA, and thus the NPDES program does not apply to nonpoint sources, such sources are accounted for through the establishment of water quality standards. See, e.g., *Simsbury-Avon Preservation Society*, 575 F3d at 219; *Meiburg*, 296 F3d at 1025; *Pronsolino*, 291 F3d at 1127. In establishing water quality standards, the CWA requires states to designate a use for each water body, specify water quality criteria that support a particular designated use, and, pursuant to a 1987 amendment, develop an antidegradation policy to protect existing uses and high quality waters. See *PUD No. 1 of Jefferson County v. Washington Dept. of Ecology*, 511 U. S. 700, 704-705 (114 SCt 1900, 128 LE2d 716) (1994) (citing 33 USC § 1313 (c) (2) (A), (d) (4) (B)); see also *Natural Resources Defense Council v. U. S. Environmental Protection Agency*, 16 F3d 1395, 1400 (4th Cir. 1993); 40 CFR § 131.12 ("The State shall develop and adopt a statewide antidegradation policy."). Because a water quality standard must be maintained, pollution caused by nonpoint source discharges that affects the water quality might require more stringent limitations

upon point source discharges than would otherwise be required under the NPDES program. See *Meiburg*, 296 F3d at 1025; see also *Miccosukee Tribe*, 541 U. S. at 107; *Arkansas*, 503 U. S. at 101.

Under the authority provided by Georgia's Water Quality Control Act ("GWQCA"), the Board of Natural Resources and EPD implement Georgia's obligations under the CWA, including administering the NPDES program for point sources and establishing the State's water quality standards. See, e.g., OCGA §§ 12-2-24; 12-5-23 (a) (1) (C) & (R); 12-5-23 (c) (1) & (15). Pursuant to CWA requirements, the Board of Natural Resources promulgated a regulation covering both water quality standards and an antidegradation policy. Ga. Comp. R. & Regs. r. 391-3-6-.03 (titled "Water Use Classifications and Water Quality Standards"); see also OCGA § 12-5-23 (a) (1) (C) (authorizing board to establish regulations governing water quality standards). That regulation includes the antidegradation rule at issue in this case, which is identical in all material respects to the EPA's minimum antidegradation policy. Compare 40 CFR § 131.12 (a) (2) (providing

minimum antidegradation policy with which a state's policy must be consistent) with Ga. Comp. R. & Regs. r. 391-3-6-.03 (2) (b) (ii).

In addition to ensuring compliance with the CWA, the GWQCA fills the CWA's regulatory gap for nonpoint sources by requiring permits for certain nonpoint source discharges. Specifically, the GWQCA provides:

> Any person desiring to erect or modify facilities or commence or alter an operation of any type which will result in the discharge of pollutants from a nonpoint source into the waters of the state, which will render or is likely to render such waters harmful to the public health, safety, or welfare, or harmful or substantially less useful for domestic, municipal, industrial, agricultural, recreational, or other lawful uses, or for animals, birds, or aquatic life, shall obtain a permit from the director to make such discharge. Any person desiring to erect, modify, alter, or commence operation of a facility which will result in such discharge but which is not discharging such pollutants as of July 1, 1974, must obtain such permit prior to the discharge of same. The director, under the conditions he prescribes, may require the submission of such plans, specifications, and other information as he deems relevant in connection with the issuance of such permits. The director may, after public notice and opportunity for public hearing, issue a permit which authorizes the person to make such discharge upon condition that such discharge meets or will meet, pursuant to any schedule of compliance included in such permit, all water quality standards, effluent limitations,

and all other requirements established pursuant to this article.

OCGA § 12-5-30 (b).

Pursuant to this statutory requirement, the Board of Natural Resources has issued permitting regulations governing nonpoint sources, including for LASs like the City's proposed facility in this case. See, e.g., Ga. Comp. R. & Regs. rr. 391-3-6-.11 (land disposal systems) and 391-3-6-.19 (land application systems).[6] For land disposal and land application systems, EPD regulations require, among other things, that pollutants be treated if they would be harmful to humans or to animal or plant life if present in state

---

[6] The terms "land disposal system" and "land application system" are identically defined as "any method of disposing pollutants in which the pollutants are applied to the surface or beneath the surface of a parcel of land and which results in pollutants percolating, infiltrating, or being absorbed into the soil and then into the waters of the State." Ga. Comp. R. & Regs. rr. 391-3-6-.11 (2) (b) (land disposal system) and 391-3-6-.19 (2) (a) (land application system). A "land disposal system" applies to pollutants generally and a "land application system" applies specifically to wastes. Ga. Comp. R. & Regs., rr. 391-3-6-.11 (1) and 391-3-6-.19 (1). Moreover, a "land disposal system" excludes landfills but includes "ponds, basins, or lagoons used for disposal of wastes or wastewaters, where evaporation and/or percolation of the wastes or wastewaters are used or intended to be used to prevent point discharge of pollutants into waters of the State," and such systems will require an NPDES permit (rather than a land disposal permit) when the system will employ a technique resulting in "one or more point source discharges into surface waters of the State." Id., r. 391-3-6-.11 (2) (b), (3).

waters, allow EPD to establish the degree of treatment required and the hydraulic loading rate for each proposed system, and specify that the groundwater leaving the boundaries of the disposal or application system must not exceed maximum contaminant levels for drinking water in accordance with other regulations. See id. rr. 391-3-6-.11 (4) and 391-3-6-.19 (4) (a) (1).

(b) *This legal context shows that Georgia's antidegradation rule does not require an antidegradation analysis for nonpoint sources.*

The Court of Appeals construed the rule to require an antidegradation analysis for nonpoint source discharges because (1) EPD must issue a permit for such discharges under OCGA § 12-5-30 (b), (2) the antidegradation rule mentions nonpoint sources, and (3) the rule does not specifically exclude nonpoint sources from the antidegradation-analysis requirement. In construing the antidegradation rule, the Court of Appeals failed to consider adequately the legal framework surrounding the rule. Georgia's antidegradation rule does not require an antidegradation analysis for nonpoint source discharges.

Because Georgia's antidegradation rule mirrors the minimum rule set forth by the EPA under 40 CFR § 131.12 (a) (2), the federal CWA is the legal context from which Georgia's antidegradation rule came and guides our interpretation of our own regulation. See, e.g., *Abrams v. Laughlin*, 304 Ga. 34, 36 (2) (816 SE2d 26) (2018) ("[I]n construing a Georgia statute that closely tracks federal statutory law, we may look to federal court decisions and commentary interpreting the federal statute as persuasive authority."); *Superior Pine Products Co. v. Williams*, 214 Ga. 485, 491 (106 SE2d 6) (1958) (where the text of a federal statute was copied into a state statute, federal law construing that text "might be strongly persuasive").

As explained above, in 1987, the CWA was amended to require states to promulgate an antidegradation policy as part of the development of water quality standards. For many years prior to the 1987 amendment, the CWA was interpreted to apply only to point sources. See, e.g., *United States v. Earth Sciences, Inc.*, 599 F2d 368, 373 (10th Cir. 1979) (concluding that certain activities may involve both point and nonpoint source discharge of pollutants, but only

"those from point sources are subject to regulation"); *Appalachian Power Co. v. Train,* 545 F2d 1351, 1373 (4th Cir. 1976) ("Congress consciously distinguished between point source and nonpoint source discharges, giving EPA authority under the [Clean Water] Act to regulate only the former."). And the water quality standards developed by the states, of which the antidegradation rule is part, have continuously been interpreted as being intertwined with the NPDES permitting program applicable *only* to point sources. See *Miccosukee Tribe*, 541 U. S. at 107 (water quality standards "directly affect local NPDES permits"); *American Paper Institute, Inc. v. U. S. Environmental Protection Agency*, 890 F2d 869, 877 (7th Cir. 1989) ("[T]he antidegradation regulation . . . do[es] not limit the permissible amount of discharge but establish[es] criteria for increasing the amount that a point source may emit.").

The 1987 amendment to the CWA cannot be read as requiring states to conduct an antidegradation analysis for nonpoint sources. The EPA's minimum rule, virtually unchanged since 1987, does refer to nonpoint sources, requiring states, in developing water

quality standards, to "assure that there shall be achieved . . . all cost-effective and reasonable best management practices for nonpoint source control." 40 CFR § 131.12 (a) (2). This requirement that states achieve "best management practices for nonpoint source control" does not require, either expressly or implicitly, states to conduct an antidegradation analysis for nonpoint sources. Such a requirement would exceed the EPA's authority; the EPA cannot force states to regulate conduct through indirect means when it cannot do so directly. See, e.g., *American Wildlands v. Browner*, 260 F3d 1192, 1198 (10th Cir. 2001) ("[T]he Act nowhere gives the EPA the authority to regulate nonpoint source discharges[.]"); *Appalachian Power Co.*, 545 F2d at 1373 (EPA has the authority to regulate only point sources).

Georgia's passage of the antidegradation rule merely satisfies its requirement under the CWA to develop water quality standards applicable to point sources. Nothing in the text of the rule suggests a broader application to include nonpoint sources. Georgia's antidegradation rule carries out the EPA's antidegradation

mandate by requiring "best management practices" for nonpoint source control. See Ga. Comp. R. & Regs. r. 391-3-6-.03 (2) (b) (ii). Ensuring best management practices is hardly textual support requiring states to conduct a rigid and thorough antidegradation analysis for nonpoint sources.

And although the CWA does not bar states from regulating nonpoint sources, nothing about our regulatory scheme in this area supports a reading that an antidegradation analysis is required for nonpoint sources. Georgia has enacted a statute requiring a permit for nonpoint sources, but this statute does not require an antidegradation analysis as a prerequisite of a permit. See OCGA § 12-5-30 (b). And the regulations applicable to LASs — the source of the discharge here — do not refer to the antidegradation rule found in Ga. Comp. R. & Regs. r. 391-3-6-.03 (2) (b) (ii) or otherwise require an antidegradation analysis. See Ga. Comp. R. & Regs. r. 391-3-6-.19. In short, nothing about the text or legal background of the antidegradation rule or legal framework of the permitting scheme

for a LAS shows that the antidegradation analysis requirement applies to nonpoint sources.

Barrow points to no authority showing that other jurisdictions have interpreted the antidegradation analysis requirement to apply to nonpoint sources. To the contrary, the weight of authority shows that issues relating to antidegradation analysis arise only in the context of point source (NPDES) permits. See, e.g., *Upper Chattahoochee Riverkeeper*, 318 Ga. App. at 503 (1) ("The specific issue for determination by the ALJ in the case [at hand] was whether the NPDES permit granted to Forsyth County's [water reclamation facilities] violated the Georgia water quality anti-degradation rule."); *Pickard v. Tenn. Water Quality Control Bd.*, 424 SW3d 511, 514 n.1, 519-525 (Tenn. 2013) (concluding that a party challenging the issuance of NPDES permit on basis of antidegradation policy must first exhaust administrative remedies); *City of Gary v. Ind. Dept. of Environmental Mgmt.*, 967 NE2d 1053 (Ind. Ct. App. 2012) (evaluating whether state agency reasonably interpreted antidegradation requirement in issuing NPDES permit

for a new wastewater treatment plant); *Native Village of Point Hope v. U.S. Environmental Protection Agency*, No. 3:11-CV-00200-TMB, 2012 WL 12898808, at \*11 n.88 (D. Alaska Sept. 14, 2012) ("The 1987 Water Quality Act Amendments to the Clean Water Act (CWA) explicitly incorporated reference to antidegradation policies in section 303 (d) (4) (B), which requires that such antidegradation requirements be satisfied prior to modifying certain NPDES permits to include less stringent effluent limitations (this concept is referred to as antibacksliding)."); *People to Save Sheyenne River, Inc. v. N.D. Dept. of Health*, 744 NW2d 748, 753-755 (N.D. 2008) (evaluating challenge to agency's decision to modify NPDES permit on basis that agency failed to conduct antidegradation review); *Ill. Environmental Protection Agency v. Ill. Pollution Control Bd.*, 896 NE2d 479, 487-492 (Ill. App. Ct. 2008) (affirming agency's antidegradation assessment for NPDES permit); *Save the Lake v. Schregardus*, 752 NE2d 295, 298, 300-301 (Ohio App. Ct. 2001) (determining whether the state agency erred in applying the state's antidegradation rule to NPDES permit

application); *Ex parte Fowl River Protective Assn., Inc.*, 572 So2d 446 (Ala. 1990) (reversing agency's interpretation of state's antidegradation policy when it issued NPDES permit); *Matter of Issuance of a Permit by Dept. of Environmental Protection to Ciba-Geigy Corp.*, 576 A2d 784, 790-792 (N. J. 1990) (concluding that agency failed to make antidegradation findings necessary to issue NPDES renewal permit); *Blue Mountain Preservation Assn., Inc. v. Dept. of Environmental Protection*, No. 1783 C.D. 2011, 2012 WL 8692599 (Pa. Comm. Ct. Apr. 25, 2012) (reviewing whether administrative board correctly determined that NPDES permit complied with antidegradation regulations). Barrow has identified no equivalent case law applying similar rules to nonpoint sources, and we have found none.

We conclude that the applicable regulations, when considered against the relevant legal background, do not require EPD to conduct an antidegradation analysis before issuing a permit for nonpoint sources, including LASs. The Court of Appeals erred in

concluding otherwise, and we therefore reverse the Court of Appeals.

Judgment reversed. All the Justices concur, except Warren, J., disqualified.

Decided May 20, 2019.

Certiorari to the Court of Appeals of Georgia — 344 Ga. App. 747.

Ray C. Smith, for City of Guyton.

Christopher M. Carr, Attorney General, Isaac Byrd, Deputy Attorney General, John E. Hennelly, James D. Coots, Suzanne S. Osborne, Senior Assistant Attorneys General, Margaret K. Eckrote, Jameson B. Bilsborrow, Assistant Attorneys General, Andrew A. Pinson, Solicitor-General, Ross W. Bergethon, Deputy Solicitor-General, for Richard E. Dunn.

Jonathan L. Schwartz, for Craig Barrow.