**FIRST DIVISION**
**BARNES, P. J.,**
**MERCIER and BROWN, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed. https://www.gaappeals.us/rules

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**August 20, 2020**

# In the Court of Appeals of Georgia

A19A0567. DOCTORS HOSPITAL OF AUGUSTA, LLC v. GEORGIA DEPARTMENT OF COMMUNITY HEALTH et al.

MERCIER, Judge.

In a final decision issued November 23, 2015, the Georgia Department of Community Health ("the Department") granted MCG Health, Inc.[1] d/b/a Georgia Regents Medical Center ("Georgia Regents") a Certificate of Need ("CON") to build a new hospital in Columbia County. Doctors Hospital of Augusta, LLC ("DHA"), which had competed against Georgia Regents for the CON, petitioned the superior court for review. The superior court upheld the Department's final decision, and we

---

[1] It appears that at some point during the appeal process, MCG Health, Inc. changed its name to AU Medical Center, Inc. For ease of discussion, we will refer to the parties by the names used when this appeal was docketed.

granted DHA's application for discretionary appeal. For reasons that follow, we affirm.[2]

The record shows that DHA is a 354-bed acute-care hospital located in Augusta, Richmond County, Georgia. Georgia Regents, an acute-care teaching hospital affiliated with Georgia Regents University, is also located in Augusta. In 2014, Georgia Regents, DHA, and University Health Systems, Inc. ("University Health"), a third Augusta-area hospital, filed competing applications with the Department for a CON to establish a new hospital in neighboring Columbia County. Although the applications differed in terms of location, size, and overall cost, each proposed construction of a new, 100-bed short-stay facility.[3] Columbia County, which did not have a hospital at the time, pledged to fund more than 20 percent of the total hospital cost.

---

[2] We originally issued an opinion on April 30, 2019, affirming the superior court's decision to uphold the Department's final decision. See *Doctors Hosp. of Augusta v. Dept. of Community Health*, 350 Ga. App. 36 (827 SE2d 725) (2019). On December 23, 2019, the Supreme Court of Georgia granted DHA's petition for writ of certiorari, vacated our judgment, and remanded the case to us for reconsideration in light of *City of Guyton v. Barrow*, 305 Ga. 799 (828 SE2d 366) (2019). After reconsidering our ruling in light of *City of Guyton*, we again affirm.

[3] A short-stay hospital is "a facility with an average length of stay of less than thirty (30) days." Ga. Comp. R. & Regs. r. 111-2-2-.20 (2) (n).

The Department joined the competing applications for review on July 1, 2014, and, after evaluating the proposals, awarded the CON to Georgia Regents. The two other applications were denied. DHA and University Health appealed the Department's award to the Certificate of Need Appeal Panel. Following an evidentiary hearing, a hearing officer appointed by the Appeal Panel determined that the Department had properly awarded the CON to Georgia Regents. DHA requested further review by the Department's Office of the Commissioner, which issued a final decision upholding the CON award to Georgia Regents. See OCGA § 31-6-44 (m) (unless the hearing officer's decision becomes the Department's final decision by operation of law, the commissioner's decision constitutes the Department's final decision). Following that ruling, DHA petitioned the superior court for judicial review of the Department's final decision, and the superior court affirmed.

Codified at OCGA § 31-6-40 et seq., the CON program "establishes a comprehensive system of planning for the orderly development of adequate health care services throughout the state." *Palmyra Park Hosp. v. Phoebe Sumter Med. Center*, 310 Ga. App. 487, 488 (714 SE2d 71) (2010) (citations omitted). Entities seeking to establish a new healthcare service or facility in Georgia generally must apply for a CON. See OCGA § 31-6-40 (b). The Department, which administers the

CON program and serves as Georgia's "lead planning agency for all health issues," reviews CON applications in light of 17 general considerations, including the population living in the proposed service area, existing health service alternatives in the area, project costs, and whether the proposed services are reasonably consistent with state health plan goals and objectives. See OCGA §§ 31-2-1 (1); 31-6-21 (a); 31-6-42 (a). The legislature has authorized the Department to establish procedures for managing the CON program. OCGA § 31-6-21 (a). To that end, the Department has adopted numerous administrative rules and regulations regarding program procedures and considerations. See Ga. Comp. R. & Regs. r. 111-2-2-.01 et seq.

After the Department issues its final decision regarding a CON application, an aggrieved party may seek judicial review of that ruling. See OCGA § 31-6-44.1. Ultimately, the reviewing court determines whether "any evidence" supports the Department's findings of fact and whether the conclusions of law drawn from those factual findings are sound. See *Pruitt Corp. v. Dept. of Community Health*, 284 Ga. 158, 160-161 (3) (664 SE2d 223) (2008); *Dept. of Community Health v. Emory Univ.*, 351 Ga. App. 257, 262 (830 SE2d 628) (2019). The reviewing court may reverse the Department's final decision "if it was based on legal error and unlawful procedures, was arbitrary and capricious, or prejudiced the opposing parties' substantial rights."

4

See *Palmyra Park Hosp.*, supra. On appeal, we defer to the Department's interpretation of the statutes, rules, and regulations governing the CON program "only when we are unable to determine the meaning of the legal text" after using the traditional rules of statutory construction. *City of Guyton*, supra at 802 (2).

1. With these principles in mind, we turn to DHA's arguments, including its claim that the Department improperly granted the CON to Georgia Regents pursuant to an "invalid" exception to the statutory requirements governing CON applications. The superior court rejected this argument. We find no error.

The Department determined that each of the three competing applications met the 17 general CON considerations set forth in OCGA § 31-6-42 (a). Because the applications involved a proposed short-stay hospital, however, they were also subject to OCGA § 31-6-21 (b) (8), which requires the Department to "establish service-specific need methodologies and criteria for . . . short stay hospital beds." The Department has promulgated specific short-stay hospital review criteria in Rule 111-2-2-.20. That rule includes a detailed "numerical need methodology designed to assess need for the specific purpose sought in the application." Ga. Comp. R. & Regs. r. 111-2-2-.20 (3) (b). But it also allows the Department to make an exception to the numerical need methodology in four limited circumstances, including when

5

[t]he facility is a sole community provider and more than twenty percent (20%) of the capital cost of any new, replacement or expanded facility is financed by the county governing authority . . . of the home county or the county governing authorities of a group of counties[.]

Ga. Comp. R. & Regs. r. 111-2-2-.20 (3) (c) (3).

Although the facilities proposed by Georgia Regents, DHA, and United Health did not satisfy the numerical need methodology outlined in Rule 111-2-2-.20 (3) (b), the Department found that all three fell within this "county-financed exception." Without dispute, no other hospital existed in Columbia County at the time, and the County had agreed to pay more than 20 percent of the cost of the new hospital proposed in the CON applications. DHA argues, however, that the Department's county-financed exception (generally and as applied here) contravenes the CON statutory scheme and is unreasonable, rendering the exception invalid. See *Albany Surgical v. Dept. of Community Health*, 257 Ga. App. 636, 637 (1) (572 SE2d 638) (2002) ("The test for the validity of administrative regulations is based upon a two-part analysis: (1) is the regulation authorized by statute; and (2) is the regulation reasonable?").

(a) When considering the meaning of a statute, "we must afford the statutory text its plain and ordinary meaning[.]" *Med. Center of Central Ga. v. Hosp. Auth. of*

*Monroe County*, 340 Ga. App. 499, 504 (3) (798 SE2d 42) (2017) (punctuation omitted). The applicable CON legislation requires the Department to "establish, by rule, need methodologies for new institutional health services and health facilities," including service-specific methodologies for short-stay hospitals. OCGA § 31-6-21 (b) (8). The Department complied with this mandate by enacting Rule 111-2-2-.20, which sets forth extensive short-stay hospital review considerations. Those considerations incorporate a detailed numerical formula for assessing need, subject to four exceptions. See Ga. Comp. R. & Regs. r. 111-2-2-.20 (3) (b) & (c).

According to DHA, the Department lacked authority to exempt applications from the numerical need formula. The CON legislation, however, did not compel the Department to apply any particular need assessment. It required only that, after taking into account considerations such as population, service use patterns, accessibility, and market economics, the Department promulgate *some* type of methodology or procedure for establishing need in the short-stay hospital context. See OCGA § 31-6-21 (b) (8); Merriam-Webster's Online Dictionary, http://www.merriam-webster.com/dictionary/methodology (defining "methodology" as "a particular procedure or set of procedures").

The Department fulfilled this obligation by devising a numerical formula applicable in all but four circumstances, which have their own specific criteria. Nothing in the statutory scheme forbids an exemption from the numerical need methodology. And although DHA argues that Georgia Regents evaded the service-specific need requirement, the county-financed exception merely relieved Georgia Regents from the numerical need analysis. It still had to qualify for the exception, a service-specific need requirement in itself. Georgia Regents also had to meet the general review considerations outlined in OCGA § 31-6-42 (a), as well as the other, more specific short-stay hospital requirements set forth in Ga. Comp. R. & Regs. r. 111-2-2-.20 (e) through (k).

Furthermore, the county-financed exception has been part of Rule 111-2-2-.20 since the rule became effective in 2005. See Ga. Comp. R. & Regs. r. 111-2-2-.20 (3) (c) (3) (2005). Before enacting an administrative rule, the Department must send the proposed text to legislative counsel, who then forwards it to specified legislative committees and members for oversight. See OCGA § 31-6-21.1 (b); *UHS of Anchor v. Dept. of Community Health*, 351 Ga. App. 29, 48 (1) (c) (830 SE2d 413) (2019), certiorari granted (S19C1491, February 10, 2020); *Albany Surgical*, supra at 639 (1)

(a). If legislators do not object to the proposal, the Department can adopt the rule – as was done here with Rule 111-2-2-.20. See OCGA § 31-6-21.1 (b).

"[T]he General Assembly's acquiescence to a rule is evidence that the rule came within its intent as expressed by the Code and, thus, we presume rules to correctly express the General Assembly's stated intent (as reflected in the relevant text)." *UHS of Anchor*, supra. Given the legislature's acquiescence, we presume that Rule 111-2-2-.20 and the county-financed exception fall "within the intent of the legislature[.]" *Albany Surgical*, supra; see also *UHS of Anchor*, supra. The exception does not conflict with the CON statutory scheme or undermine the legislative mandates.

(b) DHA contends that the county-financed exception is unreasonable because it does not further the health-planning purposes of the CON program. Again, we disagree.

"The judicial review of the reasonableness of a regulation . . . is limited, because the regulation must be upheld if the agency presents any evidence to support the regulation." *Albany Surgical*, supra at 640 (1) (b). In assessing Rule 111-2-2-.20 (3) (c) (3), we look first to the purpose of the CON legislation, which delegated

9

regulatory authority to the Department. See id. As explicitly provided by the General

Assembly, the purpose of the CON scheme is

> to ensure access to quality health care services and to ensure that health
> care services and facilities are developed in an orderly and economical
> manner and are made available to all citizens and that only those health
> care services found to be in the public interest shall be provided in this
> state.

OCGA § 31-6-1.

The evidence shows that the CON regulations governing short-stay hospitals

were initially developed by a technical committee appointed "to consider the best

ways to balance consumer and payer concerns, [ensure] health system viability,

minimize gaps in service delivery, ensure continuity of care [and] quality of care[,]

and support the roles of critical access, safety net, and teaching hospitals." The

committee conducted extensive research and analysis, ultimately producing

guidelines for the Department's regulations, including the county-financed exception.

With respect to that exception, the committee determined that when a county pledges

significant financial support to the sole health care service provider in the community,

the investment "reflects commitment to economic development and a desire to make

communities more attractive places to live and work." The committee drafted the

county-financed exception to recognize and support "such involvement by the county government[.]"

DHA asserts that the county-financed exception does not relate to the statutory purpose of the CON program because the exception "supports county funding and economic development, not health planning." As recognized by the General Assembly, however, health planning includes the orderly and *economical* development of health care services, as well as considerations of public interest. See OCGA § 31-6-1. The evidence shows that the county-financed exception was promulgated after extensive analysis by experts and falls within the overall purpose of the CON legislation. We find no basis for declaring it unreasonable. See *Albany Surgical*, supra ("Although it is the function of the courts to evaluate the reasonableness of an agency rule, such evaluation should credit the relevant evidence offered to support the reasonableness of the rule.") (citation and punctuation omitted).

2. DHA challenges the Department's determination that Georgia Regents met the general need requirements for a new hospital in Columbia County. Noting that the Department had previously denied CON applications for a free-standing emergency room facility in the area, DHA claims that precedent established a lack of need. Need considerations for an acute care hospital, however, differ from those surrounding a

11

free-standing emergency room facility. And the Department found a need for the proposed hospital based on rising population, general growth in the area, and increased emergency room usage at hospitals in Augusta (Richmond County). The evidence supports this finding. The Department, therefore, was authorized to conclude that Georgia Regents's CON application met the general need requirements for a new short-stay hospital in Columbia County. See *Emory Univ.*, supra at 261 ("A court called upon to review a final agency decision shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact." (citation and punctuation omitted)); *Northeast Ga. Med. Center v. Winder HMA*, 303 Ga. App. 50, 55-56 (2) (a) (693 SE2d 110) (2010) (in determining whether sufficient evidence supported the Department's decision on a CON application, "we neither reweigh the evidence, perform a de novo review, nor substitute our own judgment for that of the hearing officer as to the weight of the evidence").

3. DHA further claims that the Department misapplied the "existing alternatives" analysis required by the CON statutory scheme. Pursuant to OCGA § 31-6-42 (a) (3), the Department's CON review must take into account whether:

> Existing alternatives for providing services in the service area the same
> as the new institutional health service proposed are neither currently

12

available, implemented, similarly utilized, nor capable of providing a less costly alternative, or no certificate of need to provide such alternative services has been issued by the department and is currently valid[.]

The administrative regulations adopted by the Department restate and expand on this consideration, noting that:

1. The Department supports the concept of regionalization of those services for which a service-specific rule exists.

2. The Department shall consider economies of scale where need exists for additional services or facilities.

3. Utilization of existing facilities and services similar to a proposal to initiate services shall be evaluated to assure that unnecessary duplication of services is avoided. Where there exists significant unused capacity, initiating a similar service in another health care facility would require strong justification under other criteria.

Ga. Comp. R. & Regs. r. 111-2-2-.09 (1) (c).

DHA complains that the Department's final decision did not specifically address each of the existing alternatives "criteria" set forth in the statute and accompanying regulation. The record shows, however, that the Department conducted a detailed existing alternatives analysis, finding:

13

There are no existing alternatives to [Georgia Regents's] project except for maintaining the status quo, which would not adequately serve the needs of the service area. [Cits.] The growing population, expanding westward away from Augusta, suggests that hospital services move with that population rather than continuing to tether Columbia County residents and other residents of the service area to the Augusta area.

The legislature required the Department to consider whether alternatives to a new hospital currently existed in the proposed service area (Columbia County). See OCGA § 31-6-42 (a) (3). The Department conducted the necessary analysis and found no existing alternative other than maintaining the status quo, which, it determined, would not adequately serve the area's health care needs. The evidence supports this finding, and we will not substitute our own judgment for that of the Department as to the weight of the evidence. See *Emory Univ.*, supra*; Northeast Ga. Med. Center*, supra.

DHA also cites as error the Department's conclusion that "there are no *adequate* existing alternatives to Georgia Regents's project within the meaning of Rule 111-2-2-.09 [(1)] (c)." (Emphasis supplied.) Focusing on the word "adequate," DHA asserts that by considering the subjective notion of adequacy, the Department

14

modified the objective statutory and regulatory criteria. This myopic view of the Department's decision lacks merit.

"[W]hen reviewing whether an agency exceeded its statutory authority, we look at not only a portion of the agency decision but at the decision as a whole." *Palmyra Park Hosp.*, supra at 498 (1). Read in this manner, the final decision reveals the Department's determination that no true alternative to the proposed new hospital existed here because doing nothing – and forcing the service area population to continue seeking hospital services in Augusta – failed to meet the service area's needs. The Department considered other possible alternatives, as required by its regulations, and found that none existed, given the circumstances. In doing so, it properly exercised its statutory authority.

4. Next, DHA argues that the Department improperly applied the "tie breaker" priority considerations set forth in Ga. Comp. R. & Regs. r. 111-2-2-.09 (6). Because all three of the CON applications in this case met the general and service-specific CON criteria, the Department turned to the tie-breaking considerations used when two or more competing applications satisfy the basic requirements. The record shows that Georgia Regents benefitted from priority consideration on three grounds, while DHA received no tie-breaker awards.

15

(a) Pursuant to Rule 111-2-2-.09 (6) (a) (1),

> priority consideration will be given to a comparison of the applications
> with regard to . . . the past and present records of the facility, and other
> existing facilities in Georgia, if any, owned by the same parent
> organization, regarding the provision of service to all segments of the
> population, particularly including Medicare, Medicaid, minority patients
> and those patients with limited or no ability to pay[.]

Applying this rule, the Department gave priority consideration to Georgia
Regents after determining that it had "historically demonstrated the most commitment
to treating patients with limited or no ability to pay." DHA challenges this award on
appeal, complaining that the Department failed to take into account the indigent
service records of DHA's six "sister" hospitals located in Georgia. The Department
analyst who initially reviewed the applications, however, testified that he reviewed
*all* of the data provided by DHA, but ultimately considered the records of the actual
applicants to determine the priority award. As he explained:

> In my opinion it was reasonable and more practical and fair to look at
> each applicant as its own individual facility. If you looked at a company
> like [DHA's parent company] which has a large number of facilities,
> they would automatically win just about everything.

16

We find no error. Although DHA suggests that Rule 111-2-2-.09 (6) (a) (1) obligated the Department to add the indigent care statistics of its sister hospitals to its own numbers, the regulatory language does not demand such a mechanical approach. The rule required the Department to *compare* the applications based on service records, and the record shows that the analyst did just that, reviewing all data provided. But the rule did not compel a priority award based on any numerical equation. And in this case, the Department reasonably determined, after significant analysis and comparison, that priority should be given to Georgia Regents, which had "demonstrate[d] the strongest commitment of any applicant to improving access to care for all segments of the population, particularly including those segments of the population deemed to have the most difficult time accessing and/or paying for care."

(b) DHA also asserts that the Department misapplied Rule 111-2-2-.09 (6) (a) (2), which permits priority consideration following "a comparison of the applications with regard to . . . specific services to be offered." Ga. Comp. R. & Regs. r. 111-2-2-.09 (6) (a) (2). This tie-breaker was awarded to Georgia Regents based on its plan to include a Level II trauma center and teaching hospital within its facility. The Department recognized that DHA proposed to offer pediatric inpatient services

17

at its hospital, but determined that the impact of such services would be minimal for various reasons.

According to DHA, the Department erred in (1) considering whether DHA's proposed pediatric services would be valuable to the area, and (2) crediting Georgia Regents for offering a trauma center and teaching hospital, activities that do not fall within the statutory definition of "clinical health services." See OCGA § 31-6-2 (8). Rule 111-2-2-.09 (6) (a) (2), however, expressly requires the Department to *compare* the specific services offered by the applicants, thus contemplating some analysis of the value of those services. Furthermore, the rule refers to "services," not "clinical health services." Nothing in the regulatory text prevented the Department from determining that a hospital offers a *service* by functioning as a Level II trauma center and/or a teaching hospital. Accordingly, the Department did not misapply Rule 111-2-2-.09 (6) (a) (2).

(c) DHA objects to the Department's application of Rule 111-2-2-.09 (6) (a) (7), which offers tie-breaking priority to an applicant based upon "evidence of attention to factors of cost containment, which do not diminish the quality of care or safety of the patient, but which demonstrate sincere efforts to avoid significant costs unrelated to patient care." After reviewing the applicants' various cost-containment

18

efforts, the Department declined to award an advantage under this rule to any applicant.

According to DHA, it qualified for "cost containment" priority because it "offered the lowest cost alternative (based on the cost of construction)." But the Department found that the proposal presented by University Health (the third applicant) had the lowest "total project costs," and the evidence supports this finding. University Health's proposal carried an estimated cost of $144,365,269 on 282,000 square feet of new construction (or approximately $512/square foot). Although DHA's estimated cost was slightly less at $140,701,134, its proposal involved only 229,171 square feet of new construction (or approximately $614/square foot). DHA, therefore, has not shown that it was entitled to priority on this ground.

5. Finally, DHA contends that the trial court's order affirming the Department's final decision sets forth the wrong standard of review. We have concluded, however, that the Department acted lawfully and within its authority in granting the CON to Georgia Regents. This claim of error, therefore, presents no basis for reversal. See, e.g., *Northeast Ga. Med. Center*, supra at 55 (2) ("[W]hen this Court reviews a superior court's order in an administrative proceeding, our duty is not to review whether the record supports the superior court's decision but whether the record

supports the final decision of the administrative agency.") (citation and punctuation omitted).

*Judgment affirmed. Barnes, P. J., and Brown, J., concur.*